**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITY OF SAINT PAUL, MINNESOTA, *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>　　v.<br><br>CHRISTOPHER WRIGHT, in his official capacity<br>as Secretary of Energy, *et al.*,<br><br>　　　　*Defendants*. | Case No. 25-cv-3899 |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
CONSOLIDATION UNDER RULE 65(a)(2)**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ...............................................................................................................3

    I. DOE Awards Billions in Funding Through Congressionally Mandated Programs ..............3

    II. DOE Terminates Funding to Recipients Exclusively in "Blue" States.................................7

LEGAL STANDARD.......................................................................................................11

ARGUMENT ...................................................................................................................12

    I.  This Court Has Jurisdiction Over Plaintiffs' Claims.........................................................12

    II. Plaintiffs Are Likely to Succeed on the Merits ................................................................13

        A.  Terminating Awards Exclusively in Blue States Violates the Fifth Amendment .......13

        B.  Terminating Awards Exclusively in Blue States Violates the First Amendment........17

    III. Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm.........................................20

    IV. The Balance of Equities and Public Interest Merit a Preliminary Injunction...................25

    V.  The Court Should Consolidate the Hearing on this Motion With the Trial on the Merits
       Under Rule 65(a)(2)..........................................................................................................26

CONCLUSION.................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ............................................................................... 11

*Amoco Production Co. v. Village of Gambell, AK*,
  480 U.S. 531 (1987) ................................................................................................... 11

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ................................................................................................... 13

*Am. Council of Learned Societies v. McDonald*,
  792 F. Supp. 3d 448 (S.D.N.Y. July 25, 2025) ................................................. 22, 25

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ................................................................................. 25

*Bolling v. Sharpe*,
  347 U.S. 497 (1954) ................................................................................................... 13

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ....................................................................................................... 13

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ................................................................................................... 18

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................................. 13

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432, 447 (1985) ................................................................................... 14, 17

*Climate United Fund v. Citibank, N.A.*,
  154 F.4th 809 (D.C. Cir. 2025) ............................................................................... 12

*Davis v. District of Columbia*,
  158 F.3d 1342 (D.C. Cir. 1998) ............................................................................... 21

*Doe 2 v. Shanahan*,
  917 F.3d 694 (D.C. Cir. 2019) ........................................................................... 14, 16

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................................... 18, 20, 21

*Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*,
    916 F.3d 792 (10th Cir. 2019) ........................................................................... 21

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ...................................................................... 23, 25

*Harris Cnty., Texas v. Kennedy*,
    786 F. Supp. 3d 194 (D.D.C. 2025) .............................................................. 22, 23

*Heffernan v. City of Paterson, N.J.*,
    578 U.S. 266 (2016) .......................................................................................... 18

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022) .......................................................................................... 18

*Jones ex rel. A.H. v. District of Columbia*,
    No. 20-cv-128, 2025 WL 2774107 (D.D.C. Sept. 29, 2025) .................................... 15

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 23, 24, 25

*LeBlanc v. United States*,
    50 F.3d 1025 (Fed. Cir. 1995) ........................................................................... 13

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) .......................................................................... 21

*Mid-Atl. Equity Consortium v. Dep't of Educ.*,
    No. 25-cv-1407, 2025 WL 2158340 (D.D.C. July 30, 2025) .................................... 22

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ......................................................................... 21

*NAACP v. Dep't of Educ.*,
    779 F. Supp. 3d 53 (D.D.C. 2025) ...................................................................... 21

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) ........................................................................... 1, 18, 19, 20

*Neurelis, Inc. v. Califf*,
    No. 24-cv-1576, 2025 WL 1010222 (D.D.C. Mar. 19, 2025) .................................... 13

*NIH v. Am. Pub. Health Ass'n,*
  145 S. Ct. 2658 (2025) ........................................................................................ 12

*Nieves v. Bartlett,*
  587 U.S. 391 (2019) ............................................................................................ 18

*Nken v. Folder,*
  556 U.S. 418 (2009) ............................................................................................ 13

*Omnipoint Corp. v. FCC,*
  78 F.3d 620 (D.C. Cir. 1996) .............................................................................. 14

*Perkins Coie LLP v. DOJ,*
  783 F. Supp. 3d 105 (D.D.C. 2025) ...................................................... 14, 15, 17, 22

*Rogers v. Lodge,*
  458 U.S. 613 (1982) ............................................................................................ 15

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) .............................................................................................. 21

*\*Romer v. Evans,*
  517 U.S. 620 (1996) .................................................................................. 13, 14, 17

*Singh v. Berger,*
  56 F.4th 88, 109 (D.C. Cir. 2022) ...................................................................... 21

*Sioux Valley Rural Television, Inc. v. FCC,*
  349 F.3d 667 (D.C. Cir. 2003) ...................................................................... 14, 16

*Soundboard Ass'n v. FTC,*
  251 F. Supp. 3d 55 (D.D.C. 2017) ...................................................................... 27

*True the Vote, Inc. v. Internal Revenue Serv.,*
  No. 13-cv-734, 2019 WL 2304659 (D.D.C. May 30, 2019) ................................. 19

*True the Vote, Inc. v. Internal Revenue Serv.,*
  2020 WL 5656694 (D.D.C. Sept. 23, 2020) ........................................................ 19

*Trump v. Comm. on Oversight & Reform of U.S. House of Representatives,*
  No. 19-cv-01136, 2019 WL 2063207 (D.D.C. May 9, 2019) ................................. 27

*Turner v. U.S. Agency for Glob. Media*,
　502 F. Supp. 3d 333 (D.D.C. 2020) ........................................................... 25

*U.S. Dep't of Agric. v. Moreno*,
　413 U.S. 528 (1973) ............................................................... 14, 15, 17

*United States v. Stanchich*,
　550 F.2d 1294 (2d Cir. 1977) ........................................................... 17

*United States v. Windsor*,
　570 U.S. 744, 770, 772 (2013) .................................................. 14, 17

*Vera Institute of Justice v. Dep't of Justice*,
　2025 WL 1865160 (D.D.C. July 7, 2025) ............................................ 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　429 U.S. 252 (1977) ...................................................................... 14

*Vill. of Willowbrook v. Olech*,
　528 U.S. 562 (2000) ...................................................................... 13

*Webster v. Doe*,
　486 U.S. 592 (1988) ...................................................................... 13

*West Virginia Bd. of Ed. v. Barnette*,
　319 U.S. 624 (1943) ................................................................. 1, 18

*Whitney v. California*,
　274 U.S. 357 (1927) ...................................................................... 18

**Statutes**

42 U.S.C. § 7436 ............................................................................. 24

**Rules**

Federal Rule of Civil Procedure 65(a)(2) ............................................ 26

## INTRODUCTION

The question at the heart of this case is whether the federal government can wield its enormous power to take adverse actions against private and public entities as a means of punishing disfavored political viewpoints. The answer is a resounding no. The equal protection guarantee of the Fifth Amendment prohibits federal officials from disadvantaging one group relative to another based on animus or a bare desire to harm one of them. Similarly, "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 198 (2024), and that holds particularly true for political speech, which sits at the First Amendment's core. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics." *W.V. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

Last month, senior cabinet officials brazenly violated these constitutional principles by targeting hundreds of Department of Energy (DOE) awards for termination solely because the awardees are located in states whose citizens support the opposition political party. The Court need not take Plaintiffs' word for it that Defendants terminated these awards for this discriminatory reason; Defendants themselves said so. On the day before the government shutdown began, the President said that the government "can do things during the shutdown" that are "bad for" Democrats and "irreversible," such as "cutting programs that they like." The next day, the first day of the shutdown, OMB Director Russell Vought announced on social media that the Administration was targeting "the Left's" agenda and terminating DOE awards in sixteen specific states that voted for the Democratic candidates in the most recent presidential and senatorial elections. Vought then listed each of those sixteen states to hammer home the message that those states were being targeted. DOE ultimately decided to terminate more than

300 awards, 100% of which were to awardees in "blue" states. There can be no genuine dispute that DOE chose to terminate these awards, and only these awards, on October 2 because of the political views of the citizens of the states associated with the awards.

The terminations violate the Fifth and First Amendments. Defendants had no legitimate interest in treating Plaintiffs and the other entities associated with the terminated awards differently from those affiliated with the awards that were not terminated. Animus against citizens holding particular political views is not a legitimate basis for official government action. This political targeting also constitutes direct viewpoint discrimination and retaliation against protected First Amendment activities. Defendants employed the very "intermediary strategy" of viewpoint discrimination and retaliation that the Supreme Court condemned last year, *Vullo*, 602 U.S. at 198, taking adverse action against awardees in blue states to punish the political speech and association of the citizens of those states.

Defendants' constitutional violations warrant immediate relief. Precedent dictates that First Amendment and equal protection violations constitute per se irreparable harm, and Plaintiffs are suffering numerous other acute harms as well. The projects that were canceled were designed to expand clean, affordable energy solutions for numerous communities and to reduce pollution. Because of the terminations, Plaintiffs have had to immediately cease their projects funded by the awards, lay off employees working on those projects, and notify partners that they may not be able to live up to obligations they made in reliance on the federal funding they had been promised. And unless the awards are restored imminently, Plaintiffs will need to shut down these projects permanently, wasting significant time and resources that have gone into the projects and forgoing their vital economic, health, and environmental benefits.

Because the facts of this case are clear, and to facilitate an expeditious resolution of this matter of significant public import, Plaintiffs respectfully request that the Court consolidate preliminary injunction proceedings with a trial on the merits under Rule 65(a)(2).

## BACKGROUND

I.    **DOE Awards Billions in Funding Through Congressionally Mandated Programs**

DOE carries out a vast number of programs through grants and cooperative agreements with private parties and state and local governments. Congress annually appropriates funds for these purposes, and has also appropriated tens of billions of dollars for such awards in legislation including the Infrastructure Investment and Jobs Act (IIJA) of 2021 and the Inflation Reduction Act of 2022. When DOE issues any award, it records the address of the prime grantee and the primary place of performance of the award. That information is publicly available on usaspending.gov.

Plaintiffs all received, relied upon, or stood to benefit directly from awards issued by DOE. Plaintiff Interstate Renewable Energy Council (IREC) received three awards from DOE's Office of Energy Efficiency and Renewable Energy (EERE). One award was for $6.9 million to support IREC's "Charging Smart" project, a nationwide EV charging program that provides training to local governments across the country. Nichols Decl. ¶ 3. The second was a $4.8 million award to support DOE's "SolSmart Program," a national program to help local governments reduce barriers to solar energy use for residents and businesses. *Id.* ¶ 4. The third was a $1.2 million award to help IREC's Sustainable Energy Action Committee (SEAC), which aims to develop consensus recommendations to address challenges with clean energy code enforcement and permitting approvals. *Id.* ¶ 5. IREC's address and primary place of performance listed on file with DOE in connection with the Charging Smart and SEAC awards is New York

state. *Id.* ¶ 7. Its address on file with DOE in connection with SolSmart is New York state, and the primary place of performance is listed as Washington, D.C. *Id.*

Plaintiff Plug In America received a $5 million award from EERE in August 2024 for its "Plugstar Consumer EV Education Campaign." Through the award, Plug In America aimed to reach five million consumers and auto dealers with information about electric and plug-in hybrid electric vehicles, charging, and incentives. Levin Decl. ¶ 3. Plug In America is located in California, and the primary place of performance of the award is also is California. *Id.* ¶ 4.

Plaintiff Elevate Energy (Elevate) received a $4.5 million award from EERE in October 2023 to support its "Building Performance Resource Hub" project. Evens Decl. ¶ 3. The award was issued as part of DOE's "Resilient and Efficient Codes Implementation" program. *Id.* Elevate was using these funds to help building owners, engineers, and contractors adopt updated building energy codes that increase energy efficiency. *Id.* Elevate is located in Illinois, and the primary place of performance of the award on file with DOE is Illinois. *Id.* ¶¶ 2, 5.

Plaintiffs City of Saint Paul and Southeast Community Organization were subawardees on a DOE grant to the American Lung Association to help underserved communities in Minnesota implement EV charging. Stark Decl. ¶ 5; Houmas Decl. ¶ 3. Saint Paul's subaward was for $560,844 to expand the City's EV Spot Network deep into Saint Paul's East Side neighborhoods, where residents disproportionately bear the burdens of the City's transportation energy system and do not equitably experience the benefits of clean, affordable, and reliable transportation. Stark Decl. ¶ 6. Plaintiff SECO—which is a nonprofit community organization that represents District 1 in Saint Paul—received a $100,000 subaward from the American Lung Association to promote EV expansion in the neighborhoods that it serves. Houmas Decl. ¶ 3.

Plaintiff EDF participated in, relied upon, or would have benefitted from several DOE awards designed to reduce methane emissions. One such award was a $210 million award to the Gas Technology Institute to accelerate the mitigation of methane emissions from small operators of oil and gas wells and associated infrastructure. Lieberknecht Decl. ¶ 12. EDF formally served on the advisory committee for the award. *Id.* The Gas Technology Institute is based in Illinois, and the primary place of performance of the award on file with DOE is Illinois. *Id.* ¶ 13.

EDF has also worked with Colorado State University to measure and mitigate methane emissions. A $3.5 million award to Colorado State's Methane Emissions Testing and Evaluation Center 2.0 (METEC 2.0) was advancing a core EDF initiative to reduce methane emissions. Lyon Decl. ¶ 12. The center was developing testing capabilities for methane emissions detection and measurement and would have provided EDF an opportunity to conduct testing of methane sensing and measurement technology and for benchmarking of other similar technologies. *Id.* ¶

EDF's work was also advanced by a $20 million award to Colorado State for detection and measurement of methane emissions from oil and gas operations through the North-Central Methane Center. *Id.* ¶ 13. The project's data would have helped EDF characterize methane emissions and aided its efforts to reduce those emissions. *Id.* Colorado State also would have held a competitive process for collecting the data, and EDF would have been able to compete for funding under that process. *Id.* Finally, EDF was relying on a separate $300 million award to Colorado State supporting a collaborative approach to reducing emissions at marginal conventional wells, which would have furthered EDF's organizational objective to reduce such emissions. Lieberknecht Decl. ¶ 17. Colorado State is based in Colorado, and the primary place of performance of all three awards on file with DOE is Colorado. *Id.* ¶ 18.

The DOE awards that Plaintiffs received, relied on, or directly benefited from, all of which DOE terminated or slated for termination on October 2, 2025 (the "Challenged Terminations"), are summarized in the following table:

| Awardee | Award Description | Amount | Location of Prime Awardee | Primary Place of Performance |
|---|---|---|---|---|
| Interstate Renewable Energy Council | Developing Consensus Recommendations to Address Challenges with Clean Energy Code Enforcement and Permitting Approvals | $1.2 million | NY | NY |
| Interstate Renewable Energy Council | SolSmart Program | $4.8 million | NY | DC |
| Interstate Renewable Energy Council | A Comprehensive Nationwide EV Charging Recognition and Technical Assistance Program (Charging Smart) | $6.9 million | NY | NY |
| Plug In America | Plugstar Consumer EV Education Campaign | $5 million | CA | CA |
| Elevate Energy | Building Performance Resource Hub | $4.5 million | IL | IL |
| American Lung Association (Saint Paul and SECO as subawardees) | Organizing and Supporting Underserved Communities to Design, Implement, and Use EV Charging Infrastructure | $1.7 million | MN | MN |
| Gas Technology Institute (EDF participating) | Methane Emissions Reduction Program –Well Emissions and Leakage Limitation Check | $210 million | IL | IL |
| Colorado State University (EDF participating) | Methane Emissions Testing and Evaluation Center | $3.5 million | CO | CO |
| Colorado State University (EDF participating) | Methane Emissions Reduction Program – North-Central Methane Center | $20 million | CO | CO |
| Colorado State University (EDF participating) | Methane Emissions Reduction Program – Collaborative Approach to Reducing Emissions for Marginal Conventional Wells | $300 million | CO | CO |

Each of the recipients of these awards held up their end of the bargain, performing under their cooperative agreements with DOE without issue, in some cases for years. Many of the awards were for long-term projects that ensured funding for the organizations for an extended period of time. In reliance on DOE's promises to provide funding pursuant to congressional appropriations, these organizations hired staff, entered into partnership agreements, and expended resources to ensure that they could comply with their obligations. *See, e.g.*, Levin Decl. ¶ 7; Nichols Decl. ¶ 9.

## II.    DOE Terminates Funding to Recipients Exclusively in "Blue" States

In the days and weeks leading up to a possible lapse in appropriations at the end of September 2025, President Trump threatened to retaliate against congressional Democrats and voters in their states in the event of a shutdown. For instance, on September 30, President Trump told reporters: "We can do things during the shutdown that are irreversible, that are bad for them and irreversible by them, like cutting vast numbers of people out, cutting things that they like, cutting programs that they like." Jacobson Decl. Ex. H (Cowan article). And in meetings and interviews throughout the shutdown, President Trump openly and proudly expressed his administration's intent to target anything he associated with perceived Democratic interests and priorities, stating in a cabinet meeting on October 9 that his administration was "only cutting Democrat programs." *Id.* Ex. I (Breuninger article).

Consistent with the President's wishes, on October 1, the very first day of the shutdown, Defendants targeted DOE grants in states that voted for Vice President Harris in the 2024 presidential election and have Democratic Senators. That day, it was not DOE or Secretary Wright that announced the terminations, but rather OMB Director Vought from the White House. Vought posted on X: "Nearly $8 billion in Green New Scam funding to fuel the Left's

climate agenda is being cancelled. More info to come from @ENERGY." *Id.* Ex. J (Vought

post). Vought then highlighted that the "[t]he projects are in the following states: CA, CO, CT,

DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA." *Id.*



**Russ Vought** @russvought

Nearly $8 billion in Green New Scam funding to fuel the Left's climate agenda is being cancelled. More info to come from @ENERGY.

The projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA

2:09 PM · Oct 1, 2025 · **6.1M** Views

On October 2, Wright confirmed that DOE was terminating 315 awards that had not

previously been terminated, for which the agency had awarded billions of dollars.[1] Jacobson

Decl. Ex. K (DOE press release). DOE's press release asserted that these projects "did not

adequately advance the nation's energy needs, were not economically viable, and would not

provide a positive return on investment of taxpayer dollars." *Id.* But the release contained no

specifics to support those assertions or identification of the awards that were terminated.

Of the 315 awards that were slated for termination, 314 of the awardees have an address

on file in the United States, with one located in Canada. *Id.* Ex. B (List of awards). Of the 314

U.S-based awardees, all 314—100%—are based in a state that voted for Vice President Harris in

2024 and has two Democratic-caucusing Senators (a "Blue State"). *See id.* ¶ 4; Ex. B. In

---

[1] Wright's announcement stated that 321 awards were being terminated, but that figure included six awards that were already terminated several months prior.

addition, the primary place of performance for 308 of the 315 awards slated for termination (*i.e.*, 98%) was a Blue State. *Id.* ¶ 5; Ex. B.[2]

The terminations featured several other glaring anomalies. As mentioned, it was the OMB Director who announced the terminations on October 1, not DOE, which did not issue a statement on the terminations until the next day. DOE issued an initial batch of termination letters on October 2, but these letters were not on official DOE letterhead. *See* Jacobson Decl. Exs. C–F. DOE then issued a second set of superseding termination letters without explanation a week or two later. *See, e.g.*, Nichols Decl. ¶ 8; Levin Decl. ¶ 5; Stark Decl. ¶ 11. The second termination letters were substantially identical to the original ones, except they were on DOE letterhead, signed by different DOE officials, and changed each termination's effective date to the date of the second letter. Jacobson Decl. Exs. C–F . What's more, some of the grantees on DOE's list of 315 grants slated for termination have not received termination letters at all. Lieberknecht Decl. ¶¶ 13, 18.

For those grantees, including Plaintiff awardees, that did receive termination letters, the letters were nearly identical form letters with no individualized reasoning as to the particular awards being terminated. The letters stated that the project "no longer effectuates program goals regarding feasibility due to a shift in the Department of Energy's priorities" or "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy." Jacobson Decl. Exs. C–F. The termination notices did not suggest that the awardees failed to comply with the terms and conditions of the award or that they were deficient in their performance in any manner. *See id.*

---

[2] For the one awardee located in Canada, Moment Energy Inc., the primary place of performance of the award was in Delaware. *See* Jacobson Decl. Ex. B.

According to public reporting, DOE had originally sent a broader list of more than 600 awards to OMB for potential termination. Jacobson Decl. Ex. L (Dabbs article). The broader list included awards to grantees based in states throughout the country, including Arizona, Indiana, Florida, Ohio, Louisiana, North Carolina, North Dakota, Oklahoma, South Carolina, Tennessee, Texas, Utah, West Virginia, and Wisconsin—all of which voted for President Trump in the 2024 election. *Id.* Ex. G (Broader list of awards). But Defendants did not terminate *any* awards on October 2 to grantees with addresses in those states. Instead, according to one energy lobbyist (and as the evidence demonstrates), "they basically just pulled out most, if not all, blue state projects, and that's what they announced as cuts." *Id.* Ex. L.

In programs with awards across all 50 states, such as the Grid Resilience and Innovation Partnership (GRIP) program, only projects in states that voted for Vice President Harris were cancelled on October 2, 2025, while similar projects in states that voted for President Trump were not. *See, e.g.*, DOE, GRIP Program Projects, https://perma.cc/4WZ5-YCWN (showing projects in all 50 states). Similarly, for a single DOE initiative to improve access to methane emissions monitoring data in Appalachia, DOE cancelled awards to California- and Illinois-based awardees while leaving substantively identical awards to Oklahoma- and Pennsylvania awardees in place. *See* DOE, Project Selections for FOA 3256: Methane Emissions Reduction Program Oil and Gas Methane Monitoring and Mitigation, Area of Interest 3a: Improving Access to Monitoring Data for Impacted Communities, https://perma.cc/SZ7T-LUGC.

DOE's early October termination of awards in states that voted against the President was a part of the administration's broader efforts to harm such states since the shutdown. As of October 14, the administration had "frozen or canceled nearly $28 billion that had been reserved for more than 200 projects primarily located in Democratic-led cities, congressional districts, and

states." Jacobson Decl. Ex. M (Romm & Gamio article). An analysis by the New York Times showed that the vast majority of funding cuts during the shutdown have been to grantees in states—and even congressional districts—that have recently voted for Democrats, especially in New York, California, and Chicago. *Id.* These cuts included a freeze of $18 billion in funding for two major New York City infrastructure projects: the Second Avenue subway and Hudson River tunnel. The administration also froze $2.1 billion that had been pledged to Chicago for transit upgrades, including an extension of its rail system into the South Side. *Id.*

## LEGAL STANDARD

A preliminary injunction is warranted where the plaintiff is likely to succeed on the merits, the plaintiff is likely to suffer irreparable harm absent an injunction, the balance of the equities weighs in the plaintiff's favor, and the public interest would be served by an injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The final two factors merge when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court may consider these factors independently or employ a "sliding scale" framework under which a strong showing on one factor may overcome a weaker showing on another. *See, e.g.*, *Neurelis, Inc. v. Califf*, No. 24-cv-1576, 2025 WL 1010222, at *2 (D.D.C. Mar. 19, 2025) (Mehta, J.).

Under Federal Rule of Civil Procedure 65(a)(2), "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." In considering a request for a permanent injunction, the Court applies the same standard as for a preliminary injunction, with the exception that the plaintiff must show "actual success" on the merits rather than just a "likelihood of success." *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987).

11

**ARGUMENT**

**I.    This Court Has Jurisdiction Over Plaintiffs' Claims**

In virtually every case challenging federal grant terminations this year, the government has argued that the Tucker Act precludes the district court from exercising jurisdiction, and that the plaintiffs must instead bring suit in the Court of Federal Claims. That defense is foreclosed here, because the D.C. Circuit has squarely held that district courts have jurisdiction over constitutional challenges to grant terminations, even if they lack jurisdiction over termination claims brought under the Administrative Procedure Act (APA).

In *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), the plaintiffs brought both APA claims against their grant terminations and a freestanding constitutional claim for violating the separation of powers. Although the court concluded that the Tucker Act likely precluded the APA claims, the court held (over the government's objection) that "the district court had jurisdiction over the grantees' constitutional claim." *Id.* at 817; *see also id.* at 826. The court's holding post-dated the Supreme Court's order in *National Institutes of Health v. American Public Health Ass'n*, 145 S. Ct. 2658 (2025), where a majority determined that the Tucker Act displaces the APA's waiver of sovereign immunity to preclude certain APA termination claims.

Thus, it is settled law in this Circuit that this Court has jurisdiction over Plaintiffs' constitutional challenges to the grant terminations. And even without this precedent, this Court has already concluded that constitutional grant-termination claims are different from APA claims, with this Court having jurisdiction over the former even if not the latter. *Vera Institute of Justice v. Dep't of Justice*, 2025 WL 1865160, at *6–9 (D.D.C. July 7, 2025).[3]

_____

[3] A full treatment of the jurisdictional issue is not needed given the D.C. Circuit's binding holding that jurisdiction lies over constitutional grant-termination claims. But in short, should the

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    Terminating Awards Exclusively in Blue States Violates the Fifth Amendment's Equal Protection Guarantee

Defendants' selective termination of DOE awards—limited to awards to grantees in Blue States—violates the Fifth Amendment because it is based on irrational and illegitimate animus.

The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws. *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976)). At its core, equal protection guarantees that the government must remain "open on impartial terms to all who seek its assistance." *Romer v. Evans*, 517 U.S. 620, 633 (1996). The government cannot treat similarly situated groups differently without, at a minimum, a rational reason or legitimate governmental interest for the difference in treatment. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The Supreme Court has repeatedly reaffirmed that it is irrational and illegitimate—and thus unconstitutional—for the government to treat a group differently on the basis of "animus," *Romer*, 517 U.S. at 632, or a "bare . . . desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see also, e.g.*, *United States v. Windsor*, 570 U.S.

---

government contest the issue, constitutional claims must be treated differently from APA claims for several reasons. First, sovereign immunity—which was the basis for the Supreme Court's order in *NIH*—is simply not an issue for constitutional claims seeking injunctive relief against individual officials. *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). Second, because Plaintiffs could not assert their constitutional claims in the Court of Federal Claims, *see LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995), Supreme Court precedent dictates that Congress must have included a "clear" statement intending to strip this Court's jurisdiction over constitutional claims. *See Webster v. Doe*, 486 U.S. 592, 603 (1988). The Tucker Act contains no such clear statement. Finally, with constitutional claims, the source of Plaintiffs' rights indisputably is not contractual, but rather their fundamental rights under the Constitution. *Vera Institute*, 2025 WL 1865160, at *7.

744, 770, 772, 775 (2013); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447, 450 (1985). The federal government therefore violates the Fifth Amendment when it treats similarly situated groups differently based on political animus or "an interest of retaliation" against political adversaries. *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025).

To prevail on an equal-protection claim, plaintiffs need not prove that animus was the sole, or even the primary, factor behind the government's disparate treatment; animus need only be "a motivating factor" behind the government's decision. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). And plaintiffs can prove animus based on either direct evidence or circumstantial evidence, including "the historical background of the decision, the specific sequence of events leading up to the challenged decision, and any departures from the normal procedural sequence." *Sioux Valley Rural Television, Inc. v. FCC*, 349 F.3d 667, 675 (D.C. Cir. 2003) (quoting *Omnipoint Corp. v. FCC*, 78 F.3d 620, 634 (D.C. Cir. 1996)). Thus, this Court and the D.C. Circuit have relied on "intemperate contemporaneous statements by policymakers" (including, specifically, in social media posts) and "departures from normal procedures" to determine that an executive action was based on animus. *Doe 2 v. Shanahan*, 917 F.3d 694, 699 (D.C. Cir. 2019). Once animus is shown as a motivating factor, the government must prove it would have enacted the same policy absent the discriminatory purpose. *Arlington Heights*, 429 U.S. at 270–71 n.21.

Here, Defendants treated one group—DOE awardees in Blue States and entities carrying out those awards—differently from the similarly situated group of entities affiliated with DOE awards not terminated on October 2. There is clear evidence that this differential treatment was based on political animus. Indeed, "there is no need" for the Court "to 'infer animus' in this case." *Perkins Coie*, 783 F. Supp. 3d at 168. Defendants openly and obviously chose to terminate

the 315 awards slated for termination on October 2, including those connected to Plaintiffs, based on a "bare . . . desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534. In announcing the terminations, Vought proclaimed that Defendants were targeting "the Left's climate agenda." Jacobson Decl. Ex. J. He then went out of his way to highlight that "[t]he projects are in the following states," listing sixteen states that voted for the Democratic candidates in the most recent presidential and senatorial elections. *Id.* Vought made this announcement the day after the President stated: "We can do things during the shutdown that are irreversible, that are bad for [Democrats] and irreversible by them, like . . . cutting things that they like, cutting programs that they like." Jacobson Decl. Ex. H. And the same day that DOE was issuing some of the superseding termination notices, the President reiterated: "We're only cutting Democrat programs." *Id.* Ex. I. While "discriminatory intent need not be proved by direct evidence," *Rogers v. Lodge*, 458 U.S. 613, 618 (1982), the record here is full of "smoking gun admission[s] from [federal] officials" that they acted "out of discriminatory animus." *Jones ex rel. A.H. v. District of Columbia*, No. 20-cv-128, 2025 WL 2774107, at *16 (D.D.C. Sept. 29, 2025).

      The Court can begin and end its analysis of intent with Defendants' and the President's own words. But even without these admissions, the unmistakable—and otherwise unexplainable—disparate impact of the award terminations here, coupled with the procedural irregularities that produced them, amply demonstrates Defendants' animus. *See Sioux Valley Rural Television*, 349 F.3d at 675; *Doe 2*, 917 F.3d at 699. Start with the sheer magnitude of the disparate impact: Whereas DOE had submitted to OMB a list of over 600 awards for potential termination, each and every one of the 314 U.S.-based terminated awardees resides in a Blue State. Jacobson Decl. Ex. B. One need not be a statistician to understand this partisan skew did

not happen by chance. But a statistician could confirm the odds are not just one in a trillion, but one in trillions of trillions of trillions.

Beyond that mathematical impossibility, Defendants also distinguished among essentially identical awards in a way that makes no sense except in light of their animus toward Blue States. In nationwide programs where awards were made across all 50 states, such as the Grid Resilience and Innovation Partnership program, Defendants terminated only awards to recipients in Blue States. *See, e.g.*, DOE, GRIP Program Projects, https://perma.cc/4WZ5-YCWN (showing awards in all 50 states). Similarly, DOE cancelled awards to California- and Illinois-based awardees working on a DOE initiative in Appalachia while leaving substantively identical awards to Oklahoma- and Pennsylvania awardees in place. *See* DOE, Project Selections for FOA 3256: Methane Emissions Reduction Program Oil and Gas Methane Monitoring and Mitigation, Area of Interest 3a: Improving Access to Monitoring Data for Impacted Communities, https://perma.cc/SZ7T-LUGC. There is simply no explanation for these disparities except animus.

The terminations, moreover, were riddled with unexplained "departures from normal procedures." *Doe 2*, 917 F.3d at 699. The 315 terminations were announced from the White House (on the first day of the shutdown) by OMB Director Vought—not by DOE or Secretary Wright. Jacobson Decl. Ex. J. The following day, DOE issued nearly identical form termination letters to awardees, stating that each project "no longer effectuates program goals regarding feasibility due to a shift in the Department of Energy's priorities" or "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy." Jacobson Decl. Exs. C–F. Those initial termination notices were not on official DOE letterhead but rather simply displayed "UNITED STATES DEPARTMENT OF ENERGY" at the top of

the page. *See id.* Over the following few weeks, DOE issued—without explanation—superseding termination letters, which were substantially identical to the original ones except that they were on official letterhead, were signed by different DOE officials, and changed each termination's effective date to the date of the second letter. Jacobson Decl. Exs. C–F. Inexplicably, some of the grantees on DOE's list of 315 grants slated for termination have not received termination letters at all. Lieberknecht Decl. ¶¶ 13, 18. And all of these procedural irregularities took place during the longest government shutdown in our nation's history, where the Administration took actions that have never been taken during a lapse in appropriations before.[4] The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Perkins Coie*, 783 F. Supp. 3rd at 168 (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

Defendants' intentional differential treatment of similarly situated groups is clear, and Defendants can offer no legitimate government interest in this discrimination. Neither animus nor a desire to inflict pain on a particular political group are legitimate state interests. *See Windsor*, 570 U.S. at 770, 772, 775; *Romer*, 517 U.S. at 632–33; *City of Cleburne*, 473 U.S. at 447, 450; *Moreno*, 413 U.S. at 534; *Perkins Coie*, 783 F. Supp. 3d at 168. And Defendants cannot offer any other plausible alternative explanation or justification for this differential treatment. Because Defendants terminated the awards at issue for irrational and illegitimate reasons, Plaintiffs are likely to prevail on their Fifth Amendment claim.

### B.    Terminating Awards Exclusively in Blue States Violates the First Amendment

Defendants' selective termination of awards, based on the political views and voting histories of the citizens of the states associated with the awards, also violates the First

---

[4] Luke Broadwater, *For Trump, Nothing Was Off Limits During the Shutdown*, Nov. 10, 2025, https://www.nytimes.com/2025/11/10/us/politics/trump-government-shutdown.html.

Amendment. It constitutes two types of egregious First Amendment violations: viewpoint discrimination and retaliation against protected speech and association.

It is axiomatic that the government may not "discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). It is equally established that "the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (quotations omitted). The government violates the First Amendment where it takes "an 'adverse action' in response to [] speech that 'would not have been taken absent the retaliatory motive.'" *Id.* (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)). Simply put, government officials "may not wield[] their power selectively to punish or suppress speech." *Vullo*, 602 U.S. at 198.

In evaluating Plaintiffs' claims under these doctrines, it bears emphasis that "*political* belief and association constitute the core of [the] activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976) (emphasis added); *see generally Whitney v. California*, 274 U.S. 357 (1927) (Brandeis, J., concurring). Under the First Amendment, those in power cannot dictate "what shall be orthodox in politics.'" *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016) (quoting *Barnette*, 319 U.S. at 642). Nor can the government punish citizens for how they voted. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (explaining that voting is protected by the First and Fourteenth Amendments). These principles apply with full force to the actions of the Executive Branch: agencies such as DOE and OMB must administer programs "evenhandedly and not based solely on . . . political viewpoint, or associations or perceived

associations with a particular political movement, position, or viewpoint." *True the Vote, Inc. v. Internal Revenue Serv.*, No. 13-cv-734, 2019 WL 2304659, at *5 (D.D.C. May 30, 2019), *reconsideration granted in part*, 2020 WL 5656694 (D.D.C. Sept. 23, 2020).

This is the rare case where government officials *openly* discriminated on the basis of political viewpoint and retaliated against political speech. Not only did Vought announce that Defendants were targeting "the Left's climate agenda," he also emphasized that the projects were being terminated in sixteen states where the majority of citizens have expressed their viewpoints by voting for the opposition party in the most recent presidential and senatorial elections. Jacobson Decl. Ex. J. There is no reason to highlight this fact other than to make clear that the government was intentionally targeting DOE awardees in Blue States and entities carrying out those awards in order to punish states and their citizens for their political views, including their election of Senators opposed to the President on the shutdown. That fact is confirmed by contemporaneous statements by the President that the administration was "only cutting Democrat programs," *id.* Ex. I, and "cutting things that they like, cutting programs that they like," *id.* Ex. H. And as described above in Section II.A, the sheer number of grants terminated only in Blue States makes it a mathematical certainty that Defendants intentionally discriminated on the basis of political viewpoint.

It does not matter whether Defendants were targeting Plaintiffs' own speech and association, as opposed to those of the citizens in the states where grantees were located. Just last year, the Supreme Court held that "the First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech . . . *through private intermediaries*." *Vullo*, 602 U.S. at 198 (emphasis added). In *Vullo*, a state official allegedly threatened enforcement actions against insurers and banks that had relationships with the NRA,

in order to punish or suppress the NRA's speech. *See id.* at 187. The Court rejected the state official's argument that there could be no First Amendment violation because the government actions toward the intermediaries would only directly affect "business activities"; what mattered was that the government's actual alleged "aim[]" was "punishing or suppressing speech." *Id.* at 196. The Court held that this "intermediary strategy" violated the First Amendment the same as if the state took action against the NRA's speech directly. *Id.* at 197. In fact, this strategy could be even "more effective" in punishing speech, the Court reasoned, "because intermediaries will often be less invested in the speaker's message and thus less likely to risk the regulator's ire." *Id.* at 198 (quotations omitted).

Here, Defendants have targeted intermediaries—including Plaintiffs and others holding or benefitting from the terminated grants—to discriminate against and punish the First Amendment activities of the citizens of the targeted states. As in *Vullo*, this "intermediary strategy" violates the First Amendment. *Id.* at 197–98. Indeed, as the Supreme Court forecasted, Defendants' First Amendment violations may be even "more effective" than if Defendants took action against the citizens directly, because many grantees and subgrantees will not want to "risk the regulator's ire" by challenging Defendants' conduct in court. *Id.*

In sum, there can be no genuine dispute that discrimination and retaliation on the basis of political viewpoint is the proximate reason why Defendants terminated the 315 awards—and only those 315 awards—on the day after the government shutdown began. The terminations of Plaintiffs' awards based on political speech and association cut to the "core" of the First Amendment, and are brazenly unconstitutional. *Elrod*, 427 U.S. at 356.

20

### III.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm

Defendants' violation of Plaintiffs' constitutional rights has already caused and will continue to cause Plaintiffs and their members to suffer irreparable harm.

"It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod*, 427 U.S. at 373–74); *see also, e.g.*, *NAACP v. Dep't of Educ.*, 779 F. Supp. 3d 53, 67 (D.D.C. 2025). Accordingly, the D.C. Circuit has held that "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)).

This is particularly true where, as here, Defendants have infringed fundamental, individual rights protected by the First and Fifth Amendments. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (loss of First Amendment rights constitutes irreparable harm); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025) (retaliation in response to exercise of First Amendment rights is irreparable injury); *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (First Amendment violation constituted irreparable harm); *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) (violation of Equal Protection Clause constitutes irreparable harm). For example, in *Elrod*, the Supreme Court affirmed an injunction barring a county sheriff from terminating employees solely on the ground that they were politically affiliated with the Democratic Party. 427 U.S. at 373. The Court held that the impairment of such employees' First Amendment rights "unquestionably constitutes irreparable injury." *Id.*

Even if additional proof of injury were required, Plaintiffs have more than met that burden here. If their awards are not restored imminently, all Plaintiff awardees will need to permanently shut down the programs supported by the grant funds. Levin Decl. ¶ 7; Nichols Decl. ¶ 10; Evens Decl. ¶ 8; Houmas Decl. ¶ 6; Stark Decl. ¶ 13. For Plaintiff Plug In America, the termination "abruptly halt[ed] projects midstream, including new event planning, video production, and additional dealer training." Levin Decl. ¶ 6. Plaintiff IREC "has already had to cancel 18 partner contracts" with other nonprofits as a result of the termination of its "Charging Smart" program, and has had to cancel an additional 10 partner contracts as a result of the termination of its SolSmart program. Nichols Decl. ¶ 9. The company "no longer has the resources and funding to do its work related to safe building codes and standards involving solar, storage, and EVs." *Id.* Plaintiff Elevate "will need to shut down [its] work" providing technical assistance to building professionals "unless funding is restored imminently." Evens Decl. ¶ 8. And Plaintiff SECO "will need to end all of [their] outreach activities funded by the grant." Houmas Decl. ¶ 6. Numerous courts have held that such injuries to awardees are sufficient to establish irreparable harm. *See, e.g.*, *Mid-Atl. Equity Consortium v. Dep't of Educ.*, No. 25-cv-1407, 2025 WL 2158340, at *19–20 (D.D.C. July 30, 2025) (cessation of operations and services funded by grant resulted in irreparable harm); *Am. Bar Ass'n v. DOJ*, 783 F. Supp. 3d 236, 247 (D.D.C. 2025) (same); *Harris Cnty., Texas v. Kennedy*, 786 F. Supp. 3d 194, 219–20 (D.D.C. 2025) (same); *see also, e.g.*, *Am. Council of Learned Societies v. McDonald*, 792 F. Supp. 3d 448, 495 (S.D.N.Y. July 25, 2025) (collecting cases where courts held that grant terminations risked irreparable harm absent court intervention).

Moreover, several Plaintiffs allege that they have already needed to lay off—or will soon need to lay off—employees, which courts have likewise held to constitute irreparable harm. *See,*

*e.g.*, *Mid-Atl. Equity Consortium*, 2025 WL 2158340, at \*19 ("loss of experienced staff" constituted irreparable harm); *Am. Bar Ass'n*, 783 F. Supp. 3d at 247 (irreparable harm where grant termination would force plaintiff "to lay off most or all of" the program's staff); *Harris Cnty.*, 786 F. Supp. 3d at 219–20. Plaintiff IREC has already had to lay off four staff members, and will need to cut more positions if its awards are not restored. Nichols Decl. ¶ 9. SECO "will need to lay off the two employees that [it] hired to help with community outreach promoting EV expansion." Houmas Decl. ¶ 6. Plug In America "will suffer . . . substantial layoffs of experienced staff and contractors" if its award is not quickly restored. Levin Decl. ¶ 7; *see also* Evens Decl. ¶ 8. And for many of the Plaintiff organizations, the terminated funding made up a substantial portion of their annual revenues, jeopardizing their broader operations. *See, e.g.*, Levin Decl. ¶ 7 (funding made up nearly half of current budget); Nichols Decl. ¶ 10 (funding made up 21% of revenue).

Plaintiffs also face liability to third parties with whom they have contracted in reliance on the federal funding. For example, Saint Paul "made significant investments in contracting for the purchase and installation of EV chargers, and unless funding is restored, will be at risk of breaching those contracts and associated financial loss." Stark Decl. ¶ 12. Plaintiff Plug In America also faces "liability to non-profit partners . . . with whom [it has] contracts in place," should funding not be restored. Levin Decl. ¶ 7.

The termination of Saint Paul's award will also bring "significant harms to residents of the City's East Side Neighborhoods," who are "overwhelmingly low income and will be harmed by not getting access to the electric carshare services that can help them affordably meet their daily needs." Stark Decl. ¶ 13. Not having this service "makes it harder for East Side residents to access healthcare, school, jobs[,] and other necessities." *Id.*

The terminations also "unquestionably make it more difficult for [Plaintiffs] to accomplish their primary mission[s]," which "provide[s] injury for purposes . . . [of] irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). For example, as EDF's declarations explain, "[r]educing methane from the oil and gas sector is one of EDF's top organizational priorities." Lyon Decl. ¶ 5. "EDF scientists have studied methane emissions from oil and gas for over a decade, publishing more than sixteen peer-reviewed scientific papers on the topic and contributing to more than a hundred additional studies." *Id.* EDF was "formally affiliated with, relying upon, or was participating in several . . . DOE grants" under the Methane Emissions Reduction Program established under 42 U.S.C. § 7436, as part of EDF's "core, long-standing science-based initiative to address oil and gas methane emissions in collaboration with scientists, industry, technology providers, policymakers, and community-based organizations." *Id.* ¶ 8.

EDF will no longer be able to advise and collaborate with awardees on this important work, which will "make it more difficult for [EDF] to accomplish [its] primary mission" of reducing methane emissions. *Newby*, 838 F.3d at 9. EDF will no longer be able to serve on the formal advisory committee for the Gas Technology Institute's $210 million award to accelerate the mitigation of methane emissions at lower-producing oil and gas wells. Lieberknecht ¶ 16. It will not be able to test methane emissions measurement technology using Colorado State's $3.5 million award, and will instead have to forgo testing or incur significant additional cost. Lyon Decl. ¶ 12. It will lose the opportunity to compete for sub-award funding that Colorado State University would have made available under its $20 million award. Lyon Decl. ¶ 13. And it will need to devote additional resources to make up for the loss of the $300 million award to Colorado State to develop and implement solutions to reducing methane emissions at marginal

conventional wells. Lieberknecht Decl. ¶¶ 17–22. Such harms are irreparable because they cannot be remedied by future monetary relief. *See Am. Council of Learned Societies*, 792 F. Supp. 3d at 495.

## IV.    The Balance of Equities and Public Interest Merit a Preliminary Injunction

Given the seriousness of the constitutional violations at issue, it is "self-evident" that the equities and public interest favor a preliminary injunction. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020). "The Constitution is the ultimate expression of the public interest," and "consequently, government actions in contravention of the Constitution are 'always contrary to the public interest.'" *Id.* (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)); *see also Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 335 (D.C. Cir. 2018) ("[T]he public interest favors the protection of constitutional rights."); *Newby*, 838 F.3d at 12 ("There is generally no public interest in the perpetuation of unlawful agency action.").

Moreover, all of the projects at issue served important public interests of lowering the cost of energy, expanding access to clean affordable energy, and ensuring healthier lives by reducing pollution. Levin Decl. ¶ 8; Nichols Decl. ¶ 11; Evens Decl. ¶ 9; Stark Decl. ¶¶ 13–15 Houmas Decl. ¶ 7. The EVs that Plug In America promoted "benefit underserved communities by reducing local air pollution and reducing transportation energy burden by minimizing driver expenses for vehicle fuel and maintenance." Levin Decl. ¶ 8. The termination of Elevate's award will "bring significant harms to building owners, contractors, and facility managers" that relied on Elevate, "resulting in less energy affordability and grid resilience." Evens Decl. ¶ 9. IREC has had to "turn away over 100 cities and counties seeking technical assistance under the Charging Smart program alone due to the termination." Nichols Decl. ¶ 11. The communities that SECO

serves "will lose access to EV education, delay progress toward equitable charging infrastructure, and see reduced representation in regional planning." Houmas Decl. ¶ 7. And the termination of methane grants will allow continued emissions of methane, a powerful contributor to climate change and other harmful pollutants that threaten human health and wellbeing. Lyon Decl. ¶¶ 6–7.

Communities across the country were depending on these grants to lower energy costs and improve access to clean energy alternatives. *See, e.g.*, Levin Decl. ¶ 8; Nichols Decl. ¶ 11. If the City of Saint Paul's project is not completed, "the Twin Cities region would suffer harm . . . by losing out on the reduction in air pollution from the use of gas-powered vehicles." Stark Decl. ¶ 15. Congress itself made the public interest of these projects clear, in appropriating tens of billions of dollars to DOE to fund such projects. At a minimum, it is in the public interest to maintain the status quo and allow these projects to continue while the Court assesses the legality of their termination.

By contrast, if the terminations are allowed to stand, Plaintiffs will soon need to take actions to shut down the projects permanently—actions that could not be undone even if they are ultimately successful on the merits. *See, e.g.*, Nichols Decl. ¶ 10 ("Even if funding is eventually restored, it would be difficult if not impossible for IREC to restart these programs once it has shut them down and terminated the staff working on them."); Levin Decl. ¶ 7 ("Once this work is shut down and employees are terminated, Plug In America will not be able to simply restart the work at a later time if funding is eventually restored."); *see also* Evens Decl. ¶ 8.

## V.     The Court Should Consolidate the Hearing on this Motion With the Trial on the Merits Under Rule 65(a)(2)

Federal Rule of Civil Procedure 65(a)(2) provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits

and consolidate it with the hearing." This case is especially suited for consolidation under Rule 65(a)(2). As explained above, there can be no genuine dispute over the material facts. The legal issues will be fully briefed in the context of this motion, and there would be no benefit from an additional round of briefing after this motion is decided. Accordingly, Plaintiffs request that the Court order consolidation under Rule 65(a)(2), as it has in other cases. *See, e.g.*, *Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*, No. 19-cv-01136, 2019 WL 2063207 (D.D.C. May 9, 2019) (Mehta, J.) (providing notice of intent to consolidate under Rule 65(a)(2) where the legal issues were "fully briefed" and there was no "obvious need to delay ruling on the merits to allow for development of the factual record"); *Soundboard Ass'n v. FTC*, 251 F. Supp. 3d 55, 62 (D.D.C. 2017) (Mehta, J.) (ordering consolidation under Rule 65(a)(2)).

## CONCLUSION

The Court should consolidate the hearing on this motion with the trial on the merits under Rule 65(a)(2) and enter judgment in favor of Plaintiffs and against Defendants. Alternatively, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: November 14, 2025                  Respectfully submitted,

/s/ Daniel F. Jacobson
Daniel F. Jacobson (D.C. Bar 1016621)
Stephen K. Wirth (D.C. Bar 1034038)
John Robinson (D.C. Bar 1044072)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

Vickie L. Patton (CO Bar 30370)*
Peter Zalzal (CO Bar 42164)*

Rosalie Winn (CO Bar 52662)*
Stephanie Jones (NY Bar 5590724)*
2060 Broadway, Suite 300
Boulder, CO 80302
(720) 837-6239
vpatton@edf.org

*Counsel for Plaintiff Environmental Defense Fund*

LYNDSEY OLSON
Saint Paul City Attorney

By: */s/ Kelsey McElveen*
Kelsey McElveen[+]
Office of the City Attorney
15 W. Kellogg Blvd., 400 City Hall
Saint Paul, MN 55102
(651) 226-8710

*Counsel for Plaintiff Saint Paul, Minnesota*

*Pro hac vice forthcoming
[+]Pro hac vice pending