**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CITY OF SAINT PAUL, MINNESOTA *et al.*,

                Plaintiffs,

    v.

CHRISTOPHER WRIGHT, in his official
capacity as Secretary of Energy *et al.*,

                Defendants.

Case No. 1:25-cv-03899-APM

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND................................................................2

REGULATORY BACKGROUND..........................................................................................8

LEGAL STANDARD ...........................................................................................................9

ARGUMENT .......................................................................................................................9

    I.      This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims................9

    II.     Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the
              Merits.......................................................................................................14

             A.      DOE Acted Consistently With Equal Protection Principles...................14

             B.      DOE Acted Consistently With the First Amendment...........................20

    III.    Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent
              a Preliminary Injunction.............................................................................25

    IV.    The Balance of Equities and Public Interest Make Injunctive Relief
              Inappropriate.............................................................................................29

    V.     Any Injunctive Relief Should Be Accompanied by a Bond..............................30

CONCLUSION...................................................................................................................31

## INTRODUCTION

The U.S. Department of Energy ("DOE" or "Department") administers many discretionary spending programs to support energy research, technology, and infrastructure. In May 2025, the Secretary of Energy announced a new process for evaluating financial assistance awards on a case-by-case basis aimed at ensuring that DOE's programs expend public funds wisely and responsibly. As part of that ongoing review process, both later in May 2025 and in October 2025, DOE announced the cancellation of multiple projects because they no longer effectuated the agency's priorities or the program's goals. The Plaintiffs in this action allege that they have received or directly benefited from awards terminated by DOE this year, and they seek emergency injunctive relief preventing the agency from cancelling these awards.

Plaintiffs have failed to demonstrate their entitlement to this extraordinary remedy. Even assuming that the Court has subject matter jurisdiction, Plaintiffs have not shown that they are entitled to a preliminary injunction. Plaintiffs are not likely to succeed on the merits of their constitutional claims because the Department has acted consistently with the First and Fifth Amendments. As an initial matter, to the extent that the factual premise for Plaintiffs' arguments is that DOE's terminations affect only States whose citizens voted for the Democratic nominee in the most recent presidential election (*i.e.,* "Blue States"), that factual premise appears to be incomplete. DOE has explained, with respect to individual terminations, how each termination was based on appropriate policy considerations. Moreover, the terminations at issue form part of a review of DOE grants that began in May of this year, and that affects entities residing in both States whose citizens voted for the Republican presidential nominee in 2024 (*i.e.,* "Red States") and "Blue States." In any event, Plaintiffs have not pleaded cognizable constitutional claims. With respect to their Fifth Amendment argument, Plaintiffs' claim rests on the assertion that Defendants

1

acted with "animus" against "Blue States." But States are not a "politically unpopular group" subject to equal protection's animus case law; they are separate sovereigns fully capable of representing their interests. Nor, in any event, are the political branches prohibited from making spending decisions based on geographic or political considerations, as the long tradition of earmarks (sometimes called "pork barrel" spending) exemplifies. This court should reject Plaintiffs' implicit invitation to hold such actions unconstitutional. Plaintiff's First Amendment claim similarly fails. Defendants have not taken action based on the political views or beliefs of the *grantees* (or the Plaintiffs themselves, to the extent they are different). Their assertion is that Defendants considered the recent majority voting patterns of the States in which the grantees are located. But the States have no First Amendment rights that are implicated here.

Nor are the other Rule 65 factors satisfied. Plaintiffs' claimed harms, stated in economic terms, are not irreparable, and because they are not likely to succeed on their constitutional claims, they have not established constitutional injury. For all these reasons, and because—as the Supreme Court has recognized—the balance of equities favors the United States when injunctive relief would require it to pay out potentially unrecoverable grant funds, Defendants respectfully request that the Court deny Plaintiffs' motion.

## FACTUAL AND PROCEDURAL BACKGROUND

As part of its mission, DOE supports research in energy development by administering discretionary programs that award grants and cooperative agreements with state and local governments and with private organizations. Two subagencies within the Department that administer such discretionary programs are the Office of Energy Efficiency and Renewable Energy ("EERE") and the Office of Fossil Energy ("FE"). Among other tasks, EERE invests in research and development aimed at lowering the cost of energy technologies, protecting the private sector

2

from financial risk, and strengthening the U.S. power system.[1] FE invests in the research of technologies with the ability to produce abundant domestic fossil energy and critical minerals.[2]

In May 2025, the Secretary of Energy announced a new process to increase accountability and to promote the responsible expenditure of money in its discretionary funding programs.[3] In a memorandum entitled "Ensuring Responsibility for Financial Assistance," the Secretary explained that it is the policy of DOE "to ensure that financial assistance award recipients and . . . individual projects are, among other things, financially sound and economically viable, aligned with national and economic security interests, and consistent with Federal law and this Administration's policies and priorities and program goals . . . (Standards)."[4] The memorandum announced DOE's intent to "conduct focused reviews of awards and other forms of financial assistance on a case-by-case basis, especially for . . . large complex awards, or on groups of homogenous awards if DOE determines that such a review will adequately address" these goals.[5] The Secretary's memorandum further explained: "If it is determined that a project meets Standards, then those projects will proceed. If it is determined that projects do not meet Standards, DOE may modify the project or, DOE in its discretion, may terminate the project based on the outcome of DOE's evaluation, as allowed by law."[6] The overarching purpose of the review process is to ensure that DOE, consistent

---

[1] U.S. Dep't of Energy, *Office of Energy Efficiency and Renewable Energy*, https://www.energy.gov/eere/office-energy-efficiency-and-renewable-energy

[2] U.S. Dep't of Energy, *Office of Fossil Energy*, https://www.energy.gov/fecm/office-fossil-energy

[3] U.S. Dep't of Energy, *Secretary Wright Announces New Policy for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars* (May 15, 2025), https://www.energy.gov/articles/secretary-wright-announces-new-policy-increasing-accountability-identifying-wasteful

[4] *Id.*

[5] *Id.*

[6] *Id.*

with statutory authority, is prudently spending taxpayer dollars to generate the largest possible benefit to the Department's missions, including protecting America's national security and unleashing affordable, reliable, and secure energy.[7]

The Department-wide review of financial awards began in May 2025 and remains ongoing.[8] Consistent with the Secretary's Memorandum, DOE announced the termination of multiple projects later in May 2025 and in October 2025. After evaluating each award individually against specific criteria—including, for example, whether a project continues to effectuate the purpose of the program or the Department's priorities under 2 C.F.R. § 200.340(a)(4)—the Department decides whether to continue, terminate, or attempt to modify that award. If DOE decides to terminate an award, the rationale for its termination is identified in a letter transmitted to the awardee.

As part of this review process, in May 2025, DOE announced the termination of 24 awards issued by its former Office of Clean Energy Demonstrations during the prior administration that totaled over $3.7 billion.[9] The following chart lists the recipients of the cancelled awards and the State in which the recipient primarily operates:[10]

---

[7] See *id*.

[8] See *id.*

[9] U.S. Dep't of Energy, *Secretary Wright Announces Termination of 24 Projects, Generating Over $3 Billion in Taxpayer Savings* (May 30, 2025), https://www.energy.gov/articles/secretary-wright-announces-termination-24-projects-generating-over-3-billion-taxpayer. The functions of the Office of Clean Energy Demonstrations are currently being transferred elsewhere within DOE.

[10] The addresses of each grant awardee were located using usaspending.gov, the official open data source of federal spending information, including information about federal awards such as contracts and grants. Due to the press of time required while briefing this motion for extraordinary injunctive relief, DOE has not been able to independently verify the addresses listed in usaspending.gov.

| Grantee | Primary state of operation |
|---|---|
| Sutter CCUS, LLC | Texas |
| Calpine Texas CCUS Holdings, LLC | Texas |
| Research Triangle Institute | North Carolina |
| PPL Corporation | Kentucky |
| TDA Research, Inc. | Colorado |
| Brimstone Energy, Inc. | California |
| Technip Energies USA, Inc. | Texas |
| Orsted Star P2X LLC | Massachusetts |
| Gallo Glass Co. | California |
| American Cast Iron Pipe Co. | Alabama |
| United States Pipe and Foundry Co., LLC | Georgia |
| Heidelberg Materials US, Inc. | Texas |
| Libbey Glass LLC | Ohio |
| Owens-Brockway Glass Container, Inc. | Ohio |
| Skyven Technologies, Inc. | Texas |
| Kraft Heinz Food Co. | Pennsylvania |
| Eastman Chemical Co. | Tennessee |
| Diageo Americas Supply, Inc. | New York |
| Sublime Systems, Inc. | Massachusetts |
| National Cement Company of California, Inc. | California |
| Exxon Mobil Corp. | Texas |
| Nippon Dynawave Packaging Co., LLC | Washington |
| Kohler Co. | Wisconsin |
| Nevada Gold Mines, LLC | Nevada |

Of these 24 grantee awardees terminated in May, 16 of the States in which they are primarily operated awarded their electoral votes to the Republican nominee for President in 2024.

As part of this same review process, on October 2, 2025, the Department announced the termination of an additional 321 additional financial awards, totaling approximately $7.5 billion.[11]

---

[11] U.S. Dep't of Energy, *Energy Department Announces Termination of 223 Projects, Saving Over $7.5 Billion* (Oct. 2, 2025), https://www.energy.gov/articles/energy-department-announces-termination-223-projects-saving-over-75-billion

As relevant to this action, DOE terminated the following awards allegedly affecting Plaintiffs for the following reasons:[12]

- Award No. EE0011131 to the Interstate Renewable Energy Council, Inc. was terminated because the project "no longer effectuates program goals regarding feasibility due to a shift in the Department of Energy's priorities" and "is not consistent with this Administration's goals, policies, and priorities."[13]
- Award No. EE0011801 to the Interstate Renewable Energy Council, Inc. was canceled because the project "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156."[14]
- Award No. EE0009951 to the Interstate Renewable Energy Council, Inc. was terminated because the project "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156."[15]
- Award No. EE0011133 to Plug In America was cancelled because the project "no longer effectuates program goals regarding feasibility due to a shift in the Department of Energy's priorities."[16]
- Award No. EE0010930 to Elevate Energy was terminated because the project "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156."[17]

---

[12] Plaintiffs have alleged that they received, relied on, or directly benefited from ten DOE awards that were terminated in October 2025. *See* Mem. in Supp. of Plaintiffs' Mot. for Prelim. Inj. at 6 (table), ECF No. 8-1 ("PI Mot."). However, DOE has not sent any termination letter or email with respect to three of these ten awards: namely, the $210 million award to Gas Technology Institute (FE0032658); and the $20 million and $300 million awards to Colorado State University (FE0032699 and FE0032657). Plaintiffs have not submitted any termination letters or emails associated with these awards, which account for $530 million of the $557.6 million in funding Plaintiffs allege to be terminated. *See* PI Mot. at Ex. C–F; Compl. ¶ 42.

[13] PI Mot., Ex. E.

[14] *Id.*

[15] *Id.*

[16] *Id.* at Ex. D.

[17] *Id.* at Ex. C.

- Award No. EE0010622 to the American Lung Association was cancelled because the project "no longer effectuates program goals regarding feasibility due to a shift in the Department of Energy's priorities."[18]
- Award No. FE0032276 to Colorado State University was terminated because the award "is not consistent with this Administration's goals, policies and priorities" and "does not align with agency priorities." *See* ECF No. 8-21 ¶¶ 9–12.[19]

Many of the projects cancelled in October 2025 affect individuals residing in multiple States, including States with at least one Republican Senator or States in which President Trump prevailed in the electoral college in 2024.[20] The nonprofit, nonpartisan Energy Futures Initiative ("EFI") Foundation has prepared an analysis of the award terminations announced by DOE in October 2025. According to this independent analysis, the October terminations will affect 49 States, with many projects receiving funding "that spans multiple states. For example, the Department of Commerce [of] Minnesota's Grid Resilience and Innovation Partnerships award supported a transmission study spanning seven Midwest states. Other projects are headquartered in one state, but the project is sited in another state."[21] EFI's analysis also determined that of the

---

[18] Id. at Ex. F.

[19] The termination letter associated with this award is attached hereto as Exhibit 1.

[20] *See* Maeve Allsup, *Scoop: These Are the 321 Awards DOE is Canceling*, Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X (noting that "the Grid Deployment Office is canceling 25 awards, including $464 million in Grid Resilience and Innovation Partnerships funding (or GRIP) that was earmarked for the transmission stud process for five high-voltage transmission lines spanning seven states — Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota" and that "[s]everal awards, including the GDO award to the Minnesota Department of Commerce and its partners MISO and SPP for transmission studies, and a $90 million award to Mineral Basin Solar Power, . . . were actually slated to support the buildout of physical projects in states that voted for President Trump, in this case Louisiana and Pennsylvania, respectively").

[21] EFI Foundation, *Unpacking DOE's October Award Cancellations* at fig. 8 (Oct. 23, 2025), https://efifoundation.org/wp-content/uploads/sites/3/2025/10/EFI-Foundation-Unpacking-DOEs-October-Award-Cancellations.pdf

321 awards, 134 awards—totaling $794 million—had concluded their performance period before cancellation;[22] and that most of the canceled awards (165 of 321) had an end date in 2025.[23]

Further, as noted by a news article, many of the terminations announced in October 2025 "would actually have benefitted Republican strongholds," including Texas, Florida, and Louisiana.[24]  For example, one manufacturing facility funded by a terminated grant was "set to be built in Taylor, Texas," and another terminated grant was "to conduct an engineering study for a direct air capture plant in Northwest Louisiana."[25]  The article also noted that two of the States in which the terminated projects were located have Republican governors.[26]

Plaintiffs filed this action in November 2025, alleging that they have received or directly benefited from awards terminated by DOE in October.  Ignoring the broader view of DOE's remaining financial assistance portfolio, which continues to fund a diverse array of activities throughout the United States, Plaintiffs allege that Defendants have acted inconsistently with the Constitution in terminating their awards.

## REGULATORY BACKGROUND

Federal financial assistance awards may be terminated by the agency that awarded the funds "pursuant to the terms and conditions of the Federal award, including, to the extent

---

[22] *Id.* at fig. 7.

[23] EFI Foundation, *Unpacking DOE's October Award Cancellations* (Oct. 23, 2025), https://efifoundation.org/topics/innovation/unpacking-does-cancellations/

[24] Emily Pontecorvo, *The Department of Energy's Latest Cuts Will Hit Red States, Too* (Oct. 2, 2025), Heatmap, https://heatmap.news/politics/doe-canceled-grants-red-states#.  Because access to this article requires a subscription, it is attached hereto as Exhibit 2.

[25] *Id.*

[26] *Id.*

authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). DOE regulations provide for an informal dispute resolution process for the resolution of disputes over its award or administration of financial assistance. *See id.* § 910.128(a) ("Whenever practicable, DOE shall attempt to resolve informally any dispute over the award or administration of Federal financial assistance. Informal resolution, including resolution through an alternative dispute resolution mechanism, shall be preferred over formal procedures, to the extent practicable."). If any such dispute is not resolved informally, the Department transmits via certified mail a brief written determination signed by a DOE contracting officer, setting forth DOE's final disposition of the dispute. *Id.* § 910.128(c). Such final determinations may be appealed to DOE's Senior Procurement Executive. *Id.* § 910.128(d).

## LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted). A court may grant such an "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Claims.

The Court lacks jurisdiction over Plaintiffs' claims because they seek to enforce a contractual obligation to pay money and accordingly may only be heard in the Court of Federal

Claims. As an initial matter, "[t]he United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). That is especially true where, as here, Plaintiffs' claims ultimately seek monetary relief. *United States v. Testan*, 424 U.S. 392, 400–01 (1976) ("In a suit against the United States, there cannot be a right to money damages without a waiver of sovereign immunity[.]").

The government acknowledges that the APA's waiver of sovereign immunity set out in 5 U.S.C. § 702 generally applies even to non-APA claims. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006). But even assuming that Plaintiffs intend to rely on section 702 (which can apply to some non-APA claims), jurisdiction would be barred by the Tucker Act. The Tucker Act grants the Court of Federal Claims exclusive jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States[,]" 28 U.S.C. § 1491(a)(1), and waives sovereign immunity for cases falling within its grant of jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The Tucker Act therefore displaces district court jurisdiction over contract claims against the United States, even to the extent that Plaintiffs seek to rely upon section 702 to waive the Government's immunity. *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). As the Supreme Court recently explained, the section 702 waiver "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought[,]'" nor does it extend to actions "to enforce a contractual obligation to pay money," *id.* (first quoting 5 U.S.C. § 702; then quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act, courts consider "the source of the rights upon which the plaintiff bases its claims"

and "the type of relief sought[.]" *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see, e.g.*, *Crowley*, 38 F.4th at 1106 ("the question is whether Crowley's suit against the GSA . . . is 'at its essence' contractual") (quoting *id.*).

Under that framework, the Supreme Court recently held that the government was likely to succeed in showing that similar claims were committed to the Court of Federal Claims. *California*, 604 U.S. at 651. In that case, the Supreme Court considered a temporary restraining order "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," and concluded that the district court's order amounted to judicial enforcement of the Government's contractual obligations, which is committed to the jurisdiction of the Court of Federal Claims. *Id.* at 650–51 (citing *Great-West*, 534 U.S. at 212). Similarly, in *National Institutes of Health v. American Public Health Association* ("*NIH*"), the Supreme Court reiterated that the APA's "'limited waiver of [sovereign] immunity' does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. 2658, 2659 (2025) (citing *California*, 604 U.S. at 651).

Here, just as in *California*, Plaintiffs seek injunctive relief against the termination of grant agreements. *See* 604 U.S. at 650; Pls.' Proposed Order, ECF No. 8-23. And, just as in *California*, these are contract actions falling within the Tucker Act's grant of jurisdiction. *See id.* at 651. Plaintiffs' claim to grant funding depends entirely upon their contracts with DOE—they are not separately entitled to these funds under statute. Further, Plaintiffs' requested relief reinstating the terminated grants, if granted, would amount to "enforce[ment] of a contractual obligation to pay money." *See id* (citation omitted). The heart of Plaintiffs' claims, therefore, is a request to enjoin

11

the terminations of grant agreements and, accordingly, to compel the enforcement of the government's monetary obligations pursuant to those agreements. Such relief renders Plaintiffs' claims to be contract claims. *See NIH*, 135 S. Ct. at 2665 ("[P]laintiffs' claims challenging NIH's grant terminations likely belong in the Court of Federal Claims, not in federal district court . . . [t]he reason is straightforward: The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants.") (Kavanaugh, J., concurring).

Plaintiffs argue that the D.C. Circuit has held that constitutional claims arising from contracts cannot be contract actions for purposes of Court of Federal Claims jurisdiction. PI Mot. at 12 (citing *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 817 (D.C. Cir. 2025)). Defendants disagree with Plaintiffs' characterization,[27] but acknowledge that this Court has reached the same conclusion. *See Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *6 (D.D.C. July 7, 2025). Defendants respectfully disagree.

Tucker Act jurisdiction turns on whether the claim is, in essence, a contract claim, even when plaintiffs invoke another area of law to claim that the contract was terminated unlawfully. Under the precedents recently issued by the Supreme Court, as explained above, Plaintiffs bring contract claims, notwithstanding their invocation of constitutional provisions. Claims brought under constitutional provisions can be, in essence, contract claims. *See Am. Libr. Ass'n v. Sonderling*, No. CV 25-1050 (RJL), 2025 WL 1615771, at *7 (D.D.C. June 6, 2025) ("The heart

---

[27] The D.C. Circuit held that the *Climate United Fund* plaintiff had not brought a constitutional claim. *Id.* at 826 ("As an initial matter, this is not a constitutional claim at all[.]"). It did not hold that all claims pled as "constitutional claims" were categorically subject to district court jurisdiction. *Id.* (holding that the district court had jurisdiction over the Inflation Reduction Act statutory claims styled as constitutional claims). Nor would such a claim be consistent with *NIH*, which also involved claims that the terminations violated the Constitution. *See NIH*, 145 S. Ct. at 2658 (holding that the district court lacked jurisdiction to hear the plaintiffs' constitutional claims challenging grant terminations).

of these allegations is that defendants have failed to comply with Congress's statutory mandates for IMLS.  However, the main mechanism through which defendants allegedly violated those mandates is by suspending and terminating grants . . . . [P]laintiffs' framing of their claims for relief under the APA and the Constitution do not necessarily take this case out of the ambit of the Tucker Act."); *see also Climate United Fund*, 154 F.4th at 820 ("[T]he fact that the grantees' "complaint nowhere mentions breach of contract . . . cannot alone suffice to establish jurisdiction in the District Court." (citation omitted)).  Indeed, the Court of Federal Claims may address claims that contracts have been terminated in violation of the Constitution under its Tucker Act jurisdiction.  *See, e.g.*, *Tucson Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647 (9th Cir. 1998) (concluding that the district court lacked jurisdiction under the Tucker Act over constitutional claims where the right was based upon the contractual agreement); *Consol. Edison Co. of N.Y. v. U.S., Dep't of Energy*, 247 F.3d 1378, 1385–86 (Fed. Cir. 2001) (directing court to transfer case asserting constitutional, including due process, claims to the Court of Federal Claims in a case sounding in contract).  There is no reason why contract claims under the *Megapulse* framework should effect an end-run around Tucker Act jurisdiction merely because Plaintiffs' claims are pleaded as constitutional claims.  *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (holding that constitutional challenges to grant terminations do not "provide a detour around the Tucker Act." (citing *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–328 (2015)); *see also Holley v. United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("The presence of a constitutional issue does not erase the jurisdiction of the Court of Federal Claims based on a properly brought claim under the Tucker Act[.]").

II.    **Plaintiffs Have Failed to Demonstrate a Likelihood of Success on the Merits.**

Plaintiffs have not demonstrated that they are likely to prevail on their equal protection and First Amendment claims. Initially, to the extent that Plaintiffs premise their claims on factual allegations that DOE's grant terminations solely affect "Blue States" and their residents, that premise is incomplete because it ignores a broader factual context. As explained above, the terminations affecting Plaintiffs form part of a months-long review process by DOE, and the grant terminations made as part of this review process include entities located in both "Red States" and "Blue States" alike. Moreover, even the effect of the October 2025 terminations cannot be cabined to only "Blue States." In any event, as explained below, Plaintiffs have failed to establish that the terminations violate their rights under the First Amendment or Equal Protection Clause.

A.    **DOE Acted Consistently With Equal Protection Principles.**

Plaintiffs similarly fail to establish likelihood of success on the merits of their Equal Protection claim. Rather, they attempt a novel argument that it is unconstitutional for funding decisions to be politically and/or geographically conscious. But such determinations do not transgress the Fifth Amendment.

At the outset, as Plaintiffs appear to recognize, the terminations are subject only to rational-basis review. *See* PI Mot. at 13 ("The government cannot treat similarly situated groups differently without, at a minimum, a rational reason or legitimate governmental interest for the difference in treatment"). "Rational-basis review affords the policy choices of the political branches 'a strong presumption of validity.'" *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993). In order for Plaintiffs to satisfy this "demanding standard," they must demonstrate that "no conceivable set of facts could support the challenged policy." *Id.* at 395–96. The government's action is

14

constitutional so long as it is "plausibly related to the Government's stated objective." *Trump v. Hawaii*, 585 U.S. 667, 704–05 (2018).

Here, the terminations are rationally related to a legitimate government interest. The Government has a legitimate interest in administering federal programs consistent with program goals set by a democratically elected political branch. *See also Motor Vehicle Manufacturers Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) ("A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations.") (Rehnquist, J., concurring in part and dissenting in part) (cited favorably in *Biden v. Texas*, 597 U.S. 785, 812 (2022)). And the terminations were made pursuant to DOE's contractual authority under 2 C.F.R. § 200.340(a)(4) to terminate any award that "no longer effectuates the program goals or agency priorities." With respect to individual terminations, the agency explained how each termination was based on appropriate policy considerations. *See, e.g.*, ECF No. 8-7 at 8 (terminating Plaintiffs' grant on the basis that it "does not effectuate the Department of Energy's priorities of ensuring affordable, reliable, and abundant energy to meet growing demand and/or addresses the national emergency declared pursuant to Executive Order 14156"). Thus, the termination of the awards was rationally related to the Government's interest in effectuating its goals and priorities.

Plaintiffs argue that the terminations are unconstitutional because they were motivated by animus against so-called Blue States (despite the fact that no "Blue States" are themselves grantees or parties to this litigation). But this argument fails because States are not protected by the Equal Protection Clause and partisan considerations do not evidence animus.

As an initial matter, Plaintiffs argue that the terminations are unconstitutional if animus was "not the sole, or even the primary, factor," but just one "motivating factor[.]" *Id.* at 14.

Binding Supreme Court precedent forecloses this argument. Under *Trump v. Hawaii*, the question is whether the challenged actions "can reasonably be understood to result from a justification independent of unconstitutional grounds," not whether animus is one motivating factor. 585 U.S. at 705; *see also Trump v. Orr*, No. 25A319, 2025 WL 3097824, at *1 (U.S. Nov. 6, 2025) (holding that Plaintiffs were unlikely to prevail on the merits of an animus claim where they had failed to establish that the Government's decision "lack[s] any purpose other than a bare . . . desire to harm a politically unpopular group" (quoting *Hawaii*, 585 U.S. at 705)). Because, as explained above, the terminations satisfy rational basis review, the terminations are constitutional.

But even if "animus" in a colloquial sense had been the purpose of the terminations, it was not the type of animus that the Constitution prohibits. Plaintiffs do not allege that the Defendants had animus against the grantees (or even the Plaintiffs themselves). Rather, their allegations of animus pertain to *States*, which are not protected by the Equal Protection Clause. Plaintiffs argue that terminations were motivated by a "bare desire to harm a politically unpopular group[.]" *See* PI Mot. at 15–16 (citation omitted). This putatively "politically unpopular group" consists of so-called "Blue States," as defined by Plaintiffs—separate sovereign entities with structural roles in the constitutional process. Defendants are not aware of any case that has ever concluded that sovereign states can be a "politically unpopular group" for purposes of equal protection. Indeed, the cases Plaintiff rely on involve the litigation of rights of individual entities. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (individuals who live in housing with people to whom they are not related); *United States v. Windsor*, 570 U.S. 744, 770 (2013) (same-sex couples); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) (individuals with mental disabilities); *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 168 (D.D.C. 2025). States, unlike the individuals in those cases, are political and sovereign entities and do not, themselves, have

equal protection rights.  U.S. Const. Amend. XIV, § 1 ("No State shall make or enforce any law which shall . . . deny to any *person* within its jurisdiction the equal protection of the laws.") (emphasis added).  It is therefore impossible for the federal government to direct unconstitutional animus against States in violation of equal protection.  Indeed, this makes sense: animus caselaw is about groups that may lack the ability to represent their interests; the States are necessary players in our federal system of government, with innumerate abilities to represent their interests.

But even assuming that animus directed at States, rather than at the grantees themselves, could form the basis for challenging these grant terminations, the evidence Plaintiffs cite does not establish animus.  Plaintiffs cite statements by Director Vought and President Trump referencing funding for "the Left's climate agenda" and "cutting programs that [Democrats] like."  PI Mot. at 14–15.  However, emphasizing these statements misses the effect of the termination, which implicate 49 States—which of course include congressional districts represented by Republicans—as well as previous grant terminations that cut billions of dollars in DOE awards in "Red States."[28]  Ultimately, it is a core feature of the American political system that a president will enact policies favored by his party and that may be disfavored by the opposing party. Statements to that effect are not evidence of unconstitutional animus towards the opposing party (much less, as relevant here, toward States where the 2024 election results may suggest less support for the President than other States); rather, they are a routine expression of the political process. Embracing the extreme position that such statements evince unconstitutional animus would render many government actions at the federal and state level unconstitutional.  Courts have recognized

---

[28] EFI Foundation, *Unpacking DOE's October Award Cancellations* at fig. 8 (Oct. 23, 2025), https://efifoundation.org/wp-content/uploads/sites/3/2025/10/EFI-Foundation-Unpacking-DOEs-October-Award-Cancellations.pdf

that consideration of partisan politics by the political branches does not violate the Equal Protection Clause. For example, in the context of districting, the Supreme Court has held that government consideration of a jurisdiction's political partisanship is insufficient to establish an equal protection violation. *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019) (explaining that political partisanship can be taken into account when drawing congressional districts without violating the Equal Protection Clause); *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 12 (1982) (holding that the use of political party to determine appointments did not violate equal protection).

Further, political considerations are routine when it comes to spending federal funds. For purposes of constitutional challenges, the administration of a discretionary federal subsidy program is fundamentally different from direct state interference with a particular activity. *See, e.g.*, *United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 211 (2003) (rejecting constitutional challenge to condition on federal funding of libraries requiring installation of software blocking obscene images, and explaining that "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity") (citation omitted). And political actors have funneled federal funds based on political or geographical conditions for decades, as longstanding debates over "earmarks" and "pork barrel" spending make clear. *See, e.g.*, Andrew H. Sidman, Pork Barrel Politics: How Government Spending Determines Elections in a Polarized Era (2019); Tyler Cowen, *Congress Needs to Bring Back Earmarks*, Bloomberg (Jan. 9, 2018);[29]

---

[29] Accessible at https://www.bloomberg.com/view/articles/2018-01-09/congress-needs-to-bring-back-earmarks

Jonathan Allen, *The Case for Earmarks*, Vox (June 30, 2015);[30] Diana Evans, Greasing the Wheels: Using Pork Barrel Projects to Build Majority Coalitions in Congress (2004).

When the political branches exercise their authority under the Spending Clause to make discretionary funding decisions, they "make allocations from a finite pool of resources," and therefore judicial review of such decisions "must be deferential." *Lyng v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 373 (1988). It has long been established practice that in making discretionary funding decisions, without violating the Constitution, Congress and the executive branch may earmark certain funds or engage in "pork barrel" spending that benefits entities residing in one geographical location over another, and that such decisions may take political interests into account. If Plaintiffs' equal protection challenge had merit, then every entity that lost out on such an appropriation or an earmark when arguably similar groups received funds would have an equal protection claim. But that is not the law. *See, e.g.*, *Am. Bus Ass'n v. Rogoff*, 649 F.3d 734 (D.C. Cir. 2011). In *American Bus Association*, although federal law prohibited funding to public transportation systems outside the urban area they regularly service, a congressional appropriations amendment disallowed funding for agency enforcement of this restriction solely as to one entity—Seattle's public transportation system—for the purpose of allowing special local bus service to Seattle Mariners baseball games. *Id.* at 735–36. Applying rational basis review, the D.C. Circuit rejected an equal protection challenge to this congressional appropriation allowing subsidization of one bus company but not others. *Id.* at 741–43.

Similarly, here, it is undisputed that DOE's discretionary spending decisions are subject only to rational basis review, even if—as Plaintiffs allege—the effect of a swath of those decisions

---

[30] Accessible at https://www.vox.com/2015/6/30/8864869/earmarks-pork-congress

results in some entities receive funding while other arguably similar entities do not. And as explained above, Plaintiffs are unlikely to succeed on their equal protection claim because DOE's termination decisions satisfy rational basis review. *See also XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75-78 (D.D.C. 2015) (dismissing equal protection claim because even if clean-energy vehicle manufacturers had been denied DOE loan due to the agency's desire to preserve funds for "government-favored companies," that would not overcome the rationality of the government's explanation).

**B.    DOE Acted Consistently With the First Amendment.**

Plaintiffs have failed to allege a cognizable First Amendment claim. Distilled to its essence, Plaintiffs' claim asserts that by terminating the grants of entities located in Blue States, Defendants violated the First Amendment.

This claim does not state a valid First Amendment claim. Notably, Plaintiffs do not allege—much less establish—that Defendants terminated specific grants based on the political beliefs or expressed viewpoints of the actual grantees, or even that of the Plaintiffs (to the extent they are distinct entities). Plaintiffs do not identify any speech made by Plaintiffs or political views of Plaintiffs or their members, nor do Plaintiffs claim that Defendants' actions were motivated by such speech or views. Nothing in Plaintiffs' cited statements by the President or Defendant Vought can be plausibly construed as stating that the terminations were intended to retaliate against any protected speech engaged in by Plaintiffs or their members (*e.g.*, speech related to climate-related issues). The President's statements neither mention any actions by DOE nor refer to any protected speech by anyone. Defendant Vought's statement also does not refer to any individual or entity's speech; rather, as pertinent to Plaintiffs' First Amendment claim, this statement shows only that DOE's terminations reflect the different spending priorities of a new executive administration.

Indeed, Plaintiffs appear to acknowledge that Defendants did not target any individual grantee or any Plaintiffs' speech. *See* PI Mot. at 18 (asserting that "[i]t does not matter whether Defendants were targeting Plaintiffs' own speech and association"). Instead, their argument appears to be that if they succeeded in demonstrating that the government had considered only the politics of a jurisdiction when making funding decisions, such consideration itself would violate the First Amendment. There is no support for this novel proposition.

In any event, Plaintiffs' argument proceeds on a mistaken legal basis. The premise of Plaintiffs' argument appears to be that the States themselves have First Amendment rights. Plaintiffs cite no authority suggesting that States possess First Amendment rights. Individuals, of course, have free speech rights, and the Supreme Court has recognized that "First Amendment protection extends to corporations" and other private organizations. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). But Defendants are not aware of any authority supporting the proposition that States themselves have rights protected by the First Amendment, such that action targeted against *States* would violate the First Amendment. That proposition seems dubious, given that the Amendment's purpose is to limit government action, including the actions of State governments. States also generally lack "standing as *parens patriae* to bring an action against the Federal Government" to assert alleged injuries on behalf of their citizens. *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (citation omitted).

Nor may Plaintiffs sidestep States' lack of judicially cognizable First Amendment rights through reliance on *National Rifle Association ("NRA") v. Vullo*, 602 U.S. 175 (2024). *See* PI Mot. at 19–20. In *Vullo*, the superintendent of the New York Department of Financial Services ("DFS") had informed insurers that they could avoid liability for ongoing legal investigations by agreeing to stop underwriting insurance policies for the NRA. 602 U.S. at 182–84. The Supreme

21

Court held that the First Amendment prevented the state superintendent from "threaten[ing] enforcement actions against DFS-regulated entities in order to punish or suppress the NRA's gun-promotion advocacy." *Id.* at 187. Thus, *Vullo* stands for the principle that because private organizations have First Amendment rights, state actors cannot act against those rights indirectly (*e.g.*, by threatening enforcement action against insurers because of the protected speech engaged in by an organization underwritten by the insurer) if they could not do so directly. *See id.* at 197-98 ("[T]he constitutional concerns with the kind of intermediary strategy Vullo purportedly adopted to *target* the NRA's *advocacy* . . . . allows government officials to expand their regulatory jurisdiction to *suppress the speech* of organizations that they have no direct control over.") (citation omitted) (emphasis added).

But by contrast with organizations, States do not possess First Amendment rights. Plaintiffs thus cannot assert that the First Amendment bars Defendants from acting against States' rights indirectly because unlike the organization in *Vullo*, the States do not have protected First Amendment rights. In any event, in *Vullo*, the plaintiff was the organization that alleged that its First Amendment rights had been the subject of retaliation, rather than the insurers.[31] To the extent that the insurers might have attempted to file suit to assert the NRA's First Amendment rights, they would likely have lacked standing to do so. So too here, Plaintiffs do not have third-party standing to assert the First Amendment rights of States or of anyone else.

Moreover, neither *Vullo* nor any other authority cited by Plaintiffs establishes that a State's past collective voting pattern can itself constitute speech protected under the First Amendment,

---

[31] Although the NRA had originally sued the state official and the insurers, "[t]he only claims before the [Supreme] Court . . . [we]re those against Vullo." *Vullo*, 602 U.S. at 185. The insurers did not join the NRA's certiorari petition. *See* Pet. for Certiorari, *NRA v. Vullo*, No. 22-842, 2023 WL 2413355 (Feb. 7, 2023).

much less with respect to separate plaintiffs. The only case that Plaintiffs cite from the voting context—*Burdick v. Takushi*, 504 U.S. 428 (1992)—does not stand for such a proposition. *Burdick* upheld a State election-code provision barring write-in voting. *See id.* at 440–42. As a preliminary step, the Court held that strict scrutiny would not govern its analysis of the code provision. *See id.* at 432-34. Instead, the Court explained, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against the State's interests. *Id.* at 434 (citation omitted); *see also id.* (explaining that this standard governed "the rigorousness of our inquiry into the propriety of a state election law"). *Burdick* is inapposite. This case is not a challenge to a state election law or to any attempt by Defendants to regulate the voting process, and *Burdick* did not hold that a State's collective pattern of past voting activity can constitute First Amendment protected speech. Nor does *Burdick* support the conclusion that the government is barred from taking political concerns into account when making spending decisions—which, as explained above, would be a radical proposition. *See supra* II.A.

Plaintiffs cite no other authority to support their assertion that a State's aggregate pattern of past voting activity constitutes speech protected by the First Amendment. Neither *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), nor *Houston Community College System v. Wilson*, 595 U.S. 468 (2022), stand for such a principle. Those cases instead involved, respectively, a university that withheld funds otherwise available to student organizations publishing newspapers to a group publishing a religious newspaper, and a community college board of trustees that publicly censured one of its members. *See Rosenberger*, 515 U.S. at 823–27; *Houston Cmty. Coll.,* 595 U.S. at 471–73.

Nor do Plaintiffs' cases from the public employment context support the proposition that a State's collective pattern of past voting activity is First Amendment speech. *Elrod v. Burns*, 427 U.S. 347, 361 (1976), held that outside of policymaking positions, state actors may not discharge public employees solely because of *their* political positions. *See id*. at 349–51, 367, 373. *Heffernan v. City of Paterson*, 578 U.S. 266 (2016), extended *Elrod*'s holding to prohibit state actors from taking adverse employment action against a public employee based solely on a mistaken belief as to the employee's political position. *See id*. at 268–69, 273. Initially, *Elrod* and *Heffernan* are limited to the public employment context. But in any event, the holdings in *Elrod* and *Heffernan* are founded on the principle that as individuals, public employees have First Amendment rights; these cases are about protecting individuals' rights to political expression. Plaintiffs cite no authority purporting to extend these cases' holdings to protect a State's collective pattern of past voting activity under the First Amendment. Nor, again, have Plaintiffs alleged that Defendants took action based on any *grantee's* speech or political views.

Finally, *True the Vote v. Internal Revenue Service*, No. 13-cv-734, 2019 WL 2304659 (May 30, 2019), does not advance Plaintiffs' claim. To settle that case, the Internal Revenue Service agreed to a consent order including a declaratory judgment that it could not take actions based solely on the political position of "a tax-exempt applicant or entity[]." *Id*. at *5. The IRS is not a defendant here and Defendants are not subject to this decree. Additionally, unlike here, *True the Vote* involves government action taken based on the political views of an applicant for government benefits. And unlike tax-exempt individuals or private associations, States do not have First Amendment rights and nothing in *True the Vote* supports the proposition that a State's collective pattern of past voting activity receives First Amendment protection.

Even assuming *arguendo* the truth of Plaintiffs' allegations that Defendants' terminations were based in part on geographical and /or political considerations, as explained above, *see supra* II.A, it is a long-established practice that, when making discretionary funding decisions, the federal government may earmark funds that benefit individuals or organizations residing in one geographic location over another, and may take political considerations into account in making those geographic selections. Although reasonable minds may differ on whether such "pork barrel" spending is positive or negative as a policy matter, such discretionary funding decisions does not raise constitutional concerns. And nothing in Plaintiffs' motion suggests that DOE's funding decisions here are inconsistent with the First Amendment. Plaintiffs have thus failed to show that they are likely to succeed on the merits of their First Amendment claim.

## III.    Plaintiffs Have Not Shown That They Will Incur Irreparable Harm Absent a Preliminary Injunction.

To obtain preliminary injunctive relief, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and great; it must be actual and not theoretical," and "the injury must be beyond remediation." *Id*. (citation omitted). Plaintiffs have not satisfied this high standard.

Plaintiffs' primary argument that they suffer irreparable harm is that their constitutional rights have been violated. PI Mot. at 21. However, courts in this circuit "do not 'axiomatically' find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its [constitutional] rights." *Hanson v. Dist. of Columbia*, 120 F.4th 223, 244 (D.C. Cir. 2024) (citation omitted); *see also Ayele v. Dist. of Columbia*, 704 F. Supp. 3d 231, 239 (D.D.C. 2023) ("[T]here is no per se rule that the violation of any constitutional right is inherently irreparable."). Rather, a

plaintiff must come forward with evidence that it will be "*irreparably* harmed if . . . required to wait until the court" enters final judgment. *Hanson*, 120 F.4th at 244. Such harm must be "sufficiently certain, persuasively demonstrated, and so clearly irremediable that it warrants a court reaching out to alter the status quo before the merits are resolved." *Id*. (citation omitted). As explained above, Plaintiffs have failed to make such a demonstration.

In any event, "the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Archdiocese of Washington v. Washington Metro. Area Transit Auth*., 897 F.3d 314, 334 (D.C. Cir. 2018) (citation omitted). Because Plaintiffs have not demonstrated that they are likely to succeed on their constitutional claims, *see supra* at II, they cannot predicate irreparable harm on an establishment of likely constitutional injury. Indeed, as discussed above, there is no deprivation of *Plaintiffs'* constitutional rights—the government has not taken action based on their viewpoint, voting activities, or anything else that is constitutionally protected.

The non-constitutional harms that Plaintiffs assert, *i.e.*, lost funding, are economic and thus reparable. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("It is . . . well settled that economic loss does not, in and of itself, constitute irreparable harm."). Thus, even if the Court were to find that Plaintiffs are likely to suffer some form of economic harm, this is insufficient to demonstrate irreparable harm. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.") (citation omitted). The purpose of this suit is to preserve federal funding pursuant to Plaintiffs' grant agreements with the federal government and, as discussed above, Plaintiff has an adequate avenue to pursue such relief in the Court of Federal Claims. *See supra* at I. The associated injuries that Plaintiffs assert will result from losing

that funding—*e.g.*, "liability to third parties with whom they have contracted in reliance on the federal funding," PI Mot. at 23—are monetary and thus not irreparable.

Moreover, although monetary harm can be deemed unrecoverable because a defendant enjoys sovereign immunity, that is not the case here. Plaintiffs' alleged economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments. Sovereign immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of that statute. *See Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 37 (D.D.C. 2014). And Plaintiff Interstate Renewable Energy Council's failure to pursue any administrative remedy from DOE for the allegedly unlawful terminations—to include informal resolution and appeal to the Senior Procurement Executive, *see supra* Regulatory Background—weighs against its conclusory allegations that the asserted harms are irreparable.

And although pecuniary loss "that threatens the very existence of the movant's business" can establish irreparable harm, *Wisconsin Gas Co.*, 758 F.2d at 674 (citation omitted), Plaintiffs have not made such a demonstration here. A plaintiff may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief. *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. . . [does] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction."). And a plaintiff must document any claim that an alleged harm threatens its business's very existence with specific details. *See, e.g.*, *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm under this theory).

27

Here, although Plaintiffs allege that absent funding from the DOE grants, they will need to "shut down the programs supported by the grant funds" or "lay off. . . employees," PI Mot. at 22, they do not plead facts sufficient to show that they will need to shut down their operations entirely if they do not receive this funding. And without a detailed projection required under the caselaw to substantiate a claim that they will need to cease operations absent funding from DOE, Plaintiffs cannot demonstrate that they will be irreparably harmed. *See Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 513–14 (D.D.C. 2018) (despite claimed layoffs and facility closures, "it is not clear that these alleged harms are sufficiently great, certain, or imminent to warrant injunctive relief").

Moreover, Plaintiffs Environmental Defense Fund and City of Saint Paul do not allege that they will conduct layoffs or suffer any other cognizable irreparable harm in the absence of the terminated DOE funding. The only award in which Environmental Defense Fund claims to be participating and for which Plaintiffs submitted a termination letter is a $3.5 million award to Colorado State University to support testing of methane emissions measurement technology.[32] ECF No. 8-21 ¶¶ 11–12. Without the award, Environmental Defense Fund claims it "will either have to forgo this testing or incur significant additional costs," *id.* ¶ 12; as explained, mere economic injury is not irreparable harm.

Plaintiffs also misplace their reliance on *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), in arguing that like the appellants in that case, Plaintiffs have demonstrated irreparable harm. *See* PI Mot. at 24. The D.C. Circuit in *League of Women Voters* explained that new proof-of-citizenship requirements for federal elections had drastically reduced the number of voters successfully registered at the appellants' meetings. 838 F.3d at 8. The Court stated that

---

[32] Plaintiffs fail to provide any termination notice or other evidence of final DOE action to terminate three other awards in which Environmental Defense Fund claims to be participating. *See supra* n. 12.

28

because "th[ese] new obstacles unquestionably ma[de] it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm." *Id*. at 9 (citations omitted). But such "harm [was] irreparable" only "because after the registration deadlines for the November election pass, 'there can be no do over and no redress.'" *Id*. (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). By contrast, Plaintiffs have not identified any type of imminent, fixed deadline—such as a registration deadline for a federal election—after the occurrence of which "[t]he injury to these voters is real and completely irreparable." *League of Women Voters of N.C.*, 769 F.3d at 247; *see also id*. (noting that "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury" (citation omitted)). In sum, Plaintiffs fail to meet their burden to show imminent irreparable harm is likely without an injunction.

## IV.    The Balance of Equities and Public Interest Make Injunctive Relief Inappropriate.

Preliminary injunctive relief is also not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). In the context of discretionary government grants, the public interest is harmed when the United States is forced to pay out funds that it may not be able to recover. *Dep't of Educ. v. California*, 604 U.S. 650, 651-52 (2025) (per curiam). The entry of an injunction here would "harm[] the government and the public interest by preventing the Executive Branch from properly and prudently managing . . . public funds." *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 830 (D.C. Cir. 2025). Additionally, "if the grant terminations are later determined to be a breach of contract, the government may be required to pay damages to the grantees, which would substantially, if not entirely, redress the grantees' interim injuries. By contrast, if the government's position is eventually vindicated, it will have no

apparent means to recover funds spent down while the litigation has run its course." *Id*. (citation omitted).

The public interest also "favors limiting federal courts to the jurisdiction and remedies provided by Congress." *Id*. (citation omitted).  As relevant here, "Congress has explicitly channeled breach of government contract claims to the Court of Federal Claims and limited remedies to damages." *Id*. (citation omitted).  Because as explained above, Plaintiffs' claims equate to claims that in terminating grants to Plaintiffs, DOE is in breach of contract, this suit belongs more properly in the Court of Federal Claims.

Finally, the fact that the requested injunction would interfere with the executive branch's ability to make discretionary spending decisions is itself a substantial harm in the balance of the equities analysis.  "Any time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).  To the extent that the Court were to find the balance of various factors close, this equities analysis should tip against issuing an injunction.

## V.    Any Injunctive Relief Should Be Accompanied by a Bond.

Defendants respectfully request that any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate

that the Executive spend money that may be lost forever once distributed. *California*, 604 U.S. at

651–52.[33]

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny

Plaintiffs' motion for a preliminary injunction.

Dated: December 4, 2025                    Respectfully submitted,

                                           BRETT A. SHUMATE
                                           Assistant Attorney General
                                           Civil Division

                                           JOSEPH BORSON
                                           Assistant Branch Director
                                           Federal Programs Branch


                                             */s/ Daniel Riess*
                                           DANIEL RIESS (Texas Bar No. 24037359)
                                           ELIZABETH B. LAYENDECKER (Cal. Bar No.
                                           357429)
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, N.W.
                                           Washington, D.C.  20005
                                           Tel: (202) 353-3098
                                           Daniel.Riess@usdoj.gov
                                           *Attorneys for Defendants*

---

[33] Although Plaintiffs have requested consolidation of the preliminary injunction hearing with trial on the merits under Fed. R. Civ. P. 65(a)(2), PI Mot. at 26-27, the Court's order setting the hearing on Plaintiffs' preliminary injunction motion does not indicate that the Court intended to consolidate the hearing with trial on the merits.  Minute Order, Nov. 20, 2025.  Defendants respectfully agree that only Plaintiffs' preliminary injunction motion should be adjudicated at this time.  To the extent that this Court might wish to resolve that issue at this juncture, Defendants would respectfully request an opportunity to brief that question.