**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITY OF SAINT PAUL, MINNESOTA, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> CHRISTOPHER WRIGHT, in his official capacity as Secretary of Energy, *et al.*, <br><br> *Defendants*. | Case No. 25-cv-3899 |

**REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND
CONSOLIDATION UNDER RULE 65(a)(2)**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT....................................................................................................................... 3

I.     This Court Has Jurisdiction Over Plaintiffs' Claims ............................................. 3

II.    Plaintiffs Are Likely to Succeed on the Merits..................................................... 7

      A.     Defendants Do Not Rebut the Fact that They Selectively Terminated
            Grants in October Because the Awardees Are Located in Blue States.................. 7

      B.     Terminating Awards Exclusively in Blue States Violates the Fifth
            Amendment's Equal Protection Guarantee............................................................ 10

          1.     The Differential Treatment of Awardees in Blue States Is Not
                Rationally Related to Any Legitimate State Interest ............................... 10

          2.     The Terminations Violate Equal Protection Regardless of the
                Governing Standard for Animus Claims.................................................... 12

      C.     The Challenged Terminations Violate the First Amendment............................... 16

          1.     Plaintiffs Have Third-Party Standing........................................................ 16

          2.     The Terminations Violate the First Amendment Rights of Citizens ........ 19

III.   Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm......................................... 21

IV.    The Public Interest and Balance of the Equities Favor an Injunction............................. 24

V.     The Court Should Waive or Impose a Nominal Bond...................................................... 25

CONCLUSION.................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                                      Page(s)

*Am. Ass'n of Univ. Professors v. Trump,*
  2025 WL 3187762 (N.D. Cal. Nov. 14, 2025) ......................................................................5, 6

*American Public Health Ass'n v. NIH,*
  791 F. Supp. 3d 119 (D. Mass. 2025) ......................................................................................4

*Archdiocese of Washington v. WMATA,*
  97 F.3d 314 (D.C. Cir. 2018)...................................................................................................22

*Village of Arlington Heights v. Metro. Housing Dev. Corp.,*
  429 U.S. 252 (1977)..................................................................................................................14

*Barrows v. Jackson,*
  346 U.S. 249 (1953)..................................................................................................................18

*Biden v. Texas,*
  597 U.S. 785 (2022)..................................................................................................................15

*Brandon v. D.C. Bd. of Parole,*
  734 F.2d 56 (D.C. Cir. 1984)...................................................................................................10

*Chamber of Com. of U.S. v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996)...................................................................................................4

*Cicchetti v. Davis,*
  2008 WL 619013 (S.D.N.Y. Mar. 5, 2008) ...........................................................................19

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
  473 U.S. 432 (1985)..................................................................................................................11

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..................................................................................................................19

*Climate United Fund v. Citibank, N.A.,*
  154 F.4th 809 (D.C. Cir. 2025)........................................................................................2, 3, 25

*Cmty-Serv. Broad. of Mid-Am., Inc. v. FCC,*
  593 F.2d 1102 (D.C. Cir. 1978)...............................................................................................10

*Consolidated Edison Co. of New York v. Department of Energy,*
  247 F.3d 1378 (Fed. Cir. 2001).................................................................................................5

*Davis v. District of Columbia,*
  158 F.3d 1342 (D.C. Cir. 1998)...............................................................................................21

*Dep't of Educ. v. California*,
604 U.S. 650 (2025)............................................................................................3, 25

*DHS v. Regents of Univ. of Cal.*,
591 U.S. 1 (2020)....................................................................................................14

*Elrod v. Burns*,
427 U.S. 347 (1976)................................................................................................21

*Fiallo v. Bell*,
430 U.S. 787 (1977)................................................................................................13

*Fisher v. United States*,
402 F.3d 1167 (Fed. Cir. 2005)................................................................................5

*Free the Nipple-Fort Collins v. City of Fort Collins*,
916 F.3d 792 (10th Cir. 2019) ...............................................................................22

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024)...............................................................................22

*Heffernan v. City of Paterson*,
578 U.S. 266 (2016)................................................................................................11

*Kounitz v. Slaatten*,
901 F. Supp. 650 (S.D.N.Y. 1995) .........................................................................19

*\*Kowalski v. Tesmer*,
543 U.S. 125 (2004)......................................................................................2, 17, 18

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)..............................................................................23, 24

*\*LeBlanc v. United States*,
50 F.3d 1025 (Fed. Cir. 1995)..................................................................................5

*Lepelletier v. FDIC*,
164 F.3d 37 (D.C. Cir. 1999)..................................................................................18

*Mathews v. Diaz*,
426 U.S. 67 (1976)..................................................................................................14

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)..................................................................................7

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)........................................................................21, 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................................................15

*Nat. Res. Def. Council, Inc. v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971)............................................................................26

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
  602 U.S. 175 (2024)...........................................................................................17, 21

*New Jersey v. Trump*,
  131 F.4th 27 (1st Cir. 2025)...................................................................................18

*NIH v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025).........................................................................................3, 4

*Perkins Coie LLP v. DOJ*,
  783 F. Supp. 3d 105 (D.D.C. 2025).........................................................................9

*Pollack v. Hogan*,
  703 F.3d 117 (D.C. Cir. 2012)..................................................................................4

*President & Fellows of Harvard Coll. v. HHS*,
  2025 WL 2528380 (D. Mass. Sept. 3, 2025) ...........................................................7

*Rhode Island v. Trump*,
  2025 WL 3251113 (D.R.I. Nov. 21, 2025)...............................................................6

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)..................................................................................................21

*Romer v. Evans*,
  517 U.S. 620 (1996)................................................................................................11

*Rucho v. Common Cause*,
  588 U.S. 684 (2019)................................................................................................11

*Ryan, LLC v. Lew*,
  934 F. Supp. 2d 159 (D.D.C. 2013)..................................................................18, 19

*Sanchez v. Office of State Superintendent of Ed.*, 4
  5 F.4th 388 (D.C. Cir. 2022)...................................................................................15

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984)...........................................................................................16, 17

*Sharp v. Weinberger*,
  798 F.2d 1521 (D.C. Cir. 1986).................................................................................3

iv

*TikTok Inc. v. Garland*,
  122 F.4th 930 (D.C. Cir. 2004).................................................................................10

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992)....................................................................................3

*Trudeau v. FTC*,
  456 F.3d 178 (D.C. Cir. 2006).....................................................................................4

*True the Vote, Inc. v. Internal Revenue Serv.*,
  2019 WL 2304659 (D.D.C. May 30, 2019)...............................................................25

\*\*Trump v. Hawaii*,
  585 U.S. 667 (2018)............................................................................................12, 13

*Tucson Airport Authority v. General Dynamics Corp.*,
  136 F.3d 641 (9th Cir. 1998) .......................................................................................5

*Turner v. U.S. Agency for Glob. Media*,
  502 F. Supp. 3d 333 (D.D.C. 2020)......................................................................18, 19

*Tyndale House Publishers, Inc. v. Sebelius*,
  904 F. Supp. 2d 106 (D.D.C. 2012)...........................................................................19

*U.S. Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973)....................................................................................................11

*United States v. Richardson*,
  418 U.S. 166 (1974)....................................................................................................19

*United States v. Stanchich*,
  550 F.2d 1294 (2d Cir. 1977).......................................................................................9

*United States v. Windsor*,
  570 U.S. 744 (2013)....................................................................................................11

*Vera Institute of Justice v. Dep't of Justice*,
  2025 WL 1865160 (D.D.C. July 7, 2025)................................................................3, 7

*Washington v. Trump*,
  145 F.4th 1013 (9th Cir. 2025) ..................................................................................18

\*\*Webster v. Doe*,
  486 U.S. 592 (1988).....................................................................................................5

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985)....................................................................................24

**Statutes**

5 U.S.C. § 702............................................................................................................4, 7

28 U.S.C. § 1491(a)(1)...................................................................................................5

**Rules**

Federal Rule of Civil Procedure 65(c) ........................................................................26

Local Civil Rule 56.1(c) .............................................................................................23

**Other Authorities**

William Baude et al., *Hart & Wechsler's The Federal Courts and the Federal System*
      (8th ed. 2025)........................................................................................................6

**INTRODUCTION**

Defendants' opposition brief confirms what the record already made plain: Defendants have no legitimate explanation for why they singled out hundreds of Department of Energy (DOE) awards for adverse, differential treatment on October 2. Defendants do not deny that they identified more than 600 existing awards for possible termination, but chose to terminate only about half in the first days of the government shutdown—every one of which (314 in total) was to a prime recipient in a Blue State. The remaining awards, many issued under the same programs and for indistinguishable work, were left untouched. Defendants submit no declarations—or any other evidence whatsoever—to refute that the awards terminated in October were selected solely because the awardees reside in States whose citizens hold political views that Defendants disfavor. For purposes of the present proceedings, that fact is uncontested.

Equal protection does not allow the federal government to treat similarly situated entities differently without any legitimate reason. Defendants suggest their actions had a legitimate basis because DOE may terminate grants that are not aligned with the President's priorities. But under settled equal protection principles, what matters is not whether the government could, in the abstract, terminate the awards for some legitimate reason; it is whether there is a legitimate state interest that rationally explains the *differential treatment* of *these* 314 awards relative to similarly situated ones. On that question, Defendants offer nothing of substance. Defendants intimate that ripping away federal funding to punish citizens' political views is fine because there is a long history of members of Congress "making spending decisions based on geographic or political considerations," such as through earmarks or pork-barrel spending. Defs. Mem. in Opp'n ("Opp.") at 2, ECF No. 14. That comparison is absurd. Members of Congress securing more money for their districts, or even for their benefactors, is wholly different from taking away congressionally appropriated and already awarded funds based on animus or a desire for retribution towards

citizens holding disfavored political views.

Defendants' political viewpoint discrimination also violates the First Amendment. The federal government may not wield its spending power to penalize grantees because of the perceived political views and voting patterns of the citizens in their States. Nor may the federal government terminate grants to send a message that working in "Democrat" jurisdictions will put grantees at special risk. Rather than dispute these discriminatory motives, Defendants again seek refuge in other defenses, including that Plaintiffs may not bring claims based on violations of the First Amendment rights of "States." Plaintiffs, however, assert violations of the speech rights of citizens of States, not the States themselves, and Plaintiffs maintain third-party standing to assert these claims under settled doctrine. Plaintiffs' First Amendment claims fall under both of the scenarios where the Supreme Court has significantly relaxed third-party standing requirements: (1) for First Amendment claims; and (2) where the government seeks to enforce the unlawful policy "against the litigant" (*i.e.*, Plaintiffs), in a way that "would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

Beyond the merits, Defendants' Tucker Act jurisdictional defense is foreclosed by D.C. Circuit precedent recent and past. That controlling precedent aside, this Court must have jurisdiction to hear Plaintiffs' constitutional claims because otherwise Plaintiffs would have no forum to pursue these claims, an outcome the Supreme Court has essentially foreclosed.

Finally, the equities strongly favor relief. The terminations inflict classic irreparable harm: shuttered projects, lost staff, and disruptions to long-planned clean-energy work that cannot be unwound later or compensated in damages. And public interest tips decisively toward a tailored injunction that restores the status quo and prevents the federal government from administering grant programs through viewpoint-based punishment rather than lawful criteria.

**ARGUMENT**

**I.    This Court Has Jurisdiction Over Plaintiffs' Claims**

Defendants' argument that the Tucker Act strips this Court of jurisdiction over Plaintiffs' constitutional claims glosses over the fact that the D.C. Circuit has already resolved this issue. In *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809 (D.C. Cir. 2025), after finding jurisdiction lacking over the plaintiffs' APA grant-termination claims under the *Megapulse* test, the court held that "the district court had jurisdiction over the grantees' constitutional claim." *Id.* at 817; *see also id.* at 826.[1] The D.C. Circuit's holding—repeated twice—that "the district court had jurisdiction over the grantees' constitutional claim" was without qualification, and it is dispositive here.[2]

Yet Defendants address *Climate United* in just a footnote and a single sentence in the body of their brief. Opp. 12 & n.27. They assert that "the D.C. Circuit held that the Climate United Fund plaintiff had not brought a constitutional claim." *Id.* at 12 n.27. But Defendants are conflating the court's merits and jurisdictional holdings. The court's statement that the "claim was not a constitutional claim at all" was in the context of explaining why the plaintiffs were "unlikely to succeed on the merits" on their constitutional claim, because the claim derived from statutory violations. *Climate United*, 154 F.4th at 826–27. The Court made this statement after having already held that jurisdiction existed to adjudicate the claim. *See id.*

Even putting *Climate United*'s controlling holding aside, this Court must have jurisdiction

---

[1] The plaintiffs in *Climate United* argued, as Plaintiffs do here, that jurisdiction must exist over constitutional termination claims because the Court of Federal Claims lacks jurisdiction over such constitutional claims. Appellees' Br. at 43, No. 25-5122 (D.C. Cir.).

[2] Even before *Climate United*, the D.C. Circuit held that "litigants may bring … constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992) (citing *Sharp v. Weinberger*, 798 F.2d 1521, 1521 (D.C. Cir. 1986)); *see Vera Inst. of Justice v. Dept' of Justice*, 2025 WL 1865160, at *7 (D.D.C. July 7, 2025).

over Plaintiffs' equal protection and First Amendment claims, and nothing in *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025) or *Department of Education v. California*, 604 U.S. 650 (2025), is to the contrary. For the reasons explained below, Plaintiffs' constitutional claims are fundamentally different from the arbitrary-and-capricious claims under the APA that the Court addressed in those cases. Defendants are flat wrong that *NIH* "also involved claims that the terminations violated the Constitution," and that the Court "[held] that the district court lacked jurisdiction to hear the plaintiffs' constitutional claims." Opp. 12 n.27. The district court decision on appeal in *NIH* granted relief only on the plaintiffs' arbitrary-and-capricious claims. *See* 791 F. Supp. 3d 119, 177–85 (D. Mass. 2025). The parties' briefs to the Supreme Court addressed only that APA claim and not any constitutional claims, and the Justices' opinions focused only on the arbitrary-and-capricious claim, *see* 145 S. Ct. at 2661 (Barrett, J., concurring), 2665 (Kavanaugh, J., concurring in part and dissenting in part), 2666–69 (Jackson, J., dissenting). *NIH* simply did not address district court jurisdiction over constitutional claims.

One reason why the claims in *California* and *NIH* are fundamentally different from the constitutional claims here, and why the Tucker Act does not preclude jurisdiction here, is that Plaintiffs need not rely on any waiver of sovereign immunity. Defendants suggest that Plaintiffs must rely on the APA's sovereign immunity waiver in 5 U.S.C. § 702, *see* Opp. 10,[3] but separate from that waiver, the *Larson-Dugan* doctrine permits suits to enjoin individual officers such as Defendants Wright and Vought from acting unconstitutionally. *See Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012). It is settled law that, "if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar

_____

[3] Defendants cite *Trudeau v. Federal Trade Commission*, 456 F.3d 178, 186 (D.C. Cir. 2006), but the likely reason that court evaluated 5 U.S.C. § 702 rather than the *Larson-Dugan* exception is that only the agency was a defendant, not individual officers.

a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). Because "[t]he officer is not doing the business which the sovereign has empowered him to do," "there is no sovereign immunity to waive—it never attached in the first place." *Id.* (quotations omitted).

Because the decisions in *California* and *NIH* were based solely on the "Administrative Procedure Act's limited waiver of sovereign immunity," *NIH*, 145 S. Ct. at 2559 (cleaned up), they do not control here. And without sovereign immunity, the government points to no doctrinal basis upon which this Court would lack jurisdiction over Plaintiffs' claims. *See Am. Ass'n of Univ. Professors v. Trump*, 2025 WL 3187762, at *22 (N.D. Cal. Nov. 14, 2025) (explaining that "the Tucker Act's limitation on the APA's sovereign immunity waiver is irrelevant" to constitutional claims against agency leaders for grant terminations).

A second, and more fundamental, reason that this Court must have jurisdiction to hear Plaintiffs' constitutional claims is that Plaintiffs would otherwise have *no judicial forum* to present their constitutional challenges, an outcome that itself would be unconstitutional and that the Supreme Court has always prevented from happening by applying the clear statement rule from *Webster v. Doe*, 486 U.S. 592 (1988). It is firmly established that Plaintiffs may not bring their equal protection and First Amendment claims in the Court of Federal Claims. Under the relevant Tucker Act provision, 28 U.S.C. § 1491(a)(1), contractors may bring constitutional claims in the Court of Federal Claims only if the relevant provision is "money-mandating," meaning it entitles an individual to a particular sum of money. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). The Federal Circuit has held that equal protection provisions and the First Amendment are not money-mandating, and that contractors therefore cannot bring such claims in the Court of Federal Claims. *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

Defendants suggest that Plaintiffs could pursue their constitutional claims in the Court of Federal Claims, but the cases Defendants cite do not support that contention. In *Consolidated*

5

*Edison Co. of New York v. Department of Energy*, 247 F.3d 1378 (Fed. Cir. 2001), the Federal Circuit explained that the plaintiffs' claims were in the nature of "illegal exaction" claims, which are among the few constitutional claims for which the Court of Federal Claims *does* have jurisdiction. *Id.* at 1384. In *Tucson Airport Authority v. General Dynamics Corp.*, 136 F.3d 641 (9th Cir. 1998), the Ninth Circuit held that the district court lacked jurisdiction over constitutional claims that were based solely on the government's "failure to honor the terms of the [parties'] contract." *Id.* at 647. The Ninth Circuit, moreover, recognized that its decision was in tension with D.C. Circuit precedent, *id.*, and the court did not address *Webster*'s clear statement rule. Neither of these cases, nor the others that Defendants cite, override *Leblanc*'s clear holding that contractors may not bring equal protection and First Amendment claims in the Court of Federal Claims.

Where, as here, a plaintiff would lack any judicial forum to bring their constitutional challenges if a district court lacked jurisdiction, the Supreme Court requires that Congress' "intent" to produce this outcome "must be clear." *Webster*, 486 U.S. at 603. The Court "require[s] this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (quotations omitted). Applying this rule, the Supreme Court has *never* read a federal statute to preclude a party from having any forum to challenge the constitutionality of government action, to "avoid squarely facing" the "serious constitutional question" that would present. William Baude et al., *Hart & Wechsler's The Federal Courts and the Federal System* 462 (8th ed. 2025).

This Court should decline Defendants' invitation to go where the Supreme Court has never gone. The Tucker Act contains no clear statement that Congress intended to strip district courts of jurisdiction over constitutional challenges to grant terminations. Congress did not intend, for example, that the government could terminate a contract explicitly based on race or religion, and the contractor would have no forum to bring an equal protection challenge to that action. Even if

6

*Climate United* did not control (and it does), *Webster*'s clear-statement rule would. Indeed, several district courts have recently applied this principle to hold, post-*NIH*, that they had jurisdiction over constitutional challenges to grant terminations. *See Am. Ass'n of Univ. Professors*, 2025 WL 3187762, at *22; *Rhode Island v. Trump*, 2025 WL 3251113, at *4 (D.R.I. Nov. 21, 2025); *Pres. & Fellows of Harvard Coll. v. HHS*, 2025 WL 2528380, at *13 (D. Mass. Sept. 3, 2025).

Given *Webster* (and *Climate United*), this Court need not apply the *Megapulse* test to determine jurisdiction. That test was developed to assess whether the Tucker Act "implicitly forbids" district court jurisdiction over APA claims, for purposes of 5 U.S.C. § 702's sovereign immunity waiver. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 970 (D.C. Cir. 1982). *Webster* requires express, not implied, intent to preclude jurisdiction over constitutional claims. But in any event, the *Megapulse* factors weigh decidedly in favor of jurisdiction here. The source of the rights that Plaintiffs assert is the Bill of Rights of the Constitution, and not the terms of any contract. Plaintiffs' claims are "ultimately based, not on breach of contract, but on an alleged governmental violation of constitutional principles." *Vera Institute*, 2025 WL 1865160, at *7 (cleaned up). And the relief sought is not an order compelling Defendants to pay Plaintiffs money, but rather an injunction that requires Defendants to not further carry out their unconstitutional actions.

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    Defendants Do Not Rebut the Fact that They Selectively Terminated Grants in October Because the Awardees Are Located in Blue States

Defendants do not contest the central factual allegations underlying Plaintiffs' claims: (1) that Defendants' termination of DOE awards in October was driven by animus toward the political views of the citizens of Blue States; and (2) that the relevant awards were chosen for termination in October solely because the awardees reside in Blue States. Defendant Vought's own words in his social media post announcing the terminations establish these facts, as does the statistical

impossibility that Defendants did not target Blue State residents, given that all 314 of 314 awards terminated in early October had prime awardees in Blue States. Pls.' Br. 7–10.

Defendants argue that Plaintiffs' factual "premise is incomplete," Opp. 1, but Defendants certainly do not submit any *evidence* to rebut these factual propositions. They submit no declaration from any DOE decisionmaker—no one from the Secretary's office, the relevant program offices, or anyone else with personal knowledge—to deny the awards were terminated solely because the awardees were located in Blue States. Nor do they submit any declaration otherwise explaining who selected the October awards for cancellation, what criteria were used to evaluate them, or how termination decisions were actually made. And the government provides no explanation why Vought rather than someone at DOE announced the terminations, or why many awardees received multiple termination letters signed by different officials. The government has regularly and repeatedly submitted evidence purporting to explain award termination decisions in other similar cases.[4] The absence of such a proffer here confirms that there is no genuine dispute for purposes of these preliminary injunction proceedings that DOE chose to terminate these awards, and only these awards, on October 2 because of the political views of the citizens of the states associated with the awards.

The information that Defendants do set forth in their brief is simply a smokescreen for their failure to rebut these core factual allegations. Defendants suggest that the awards terminated in October were originally examined as part of a "months-long review process" that began in May, and they highlight that other awards purportedly terminated "as part of this review process in May 2025" had recipients in Red States. Opp. 4–5. But whether Defendants initially evaluated these

---

[4] For example, the government submitted *numerous* declarations by high-ranking officials purporting to justify the grant terminations at issue in *Global Health Council v. Trump*, No. 25-cv-402 (D.D.C.) (*e.g.*, ECF Nos. 25-1, 39-1, 48-2, 99-1, 135-1, 153-1). *See also, e.g.*, Henneburg Decl., *Vera Inst. v. DOJ*, No. 25-cv-1643 (D.D.C. June 9, 2025) (ECF No. 26-1).

awards as part of a broader review process is irrelevant if, as is apparent, Defendants chose to terminate these 314 awards on October 2 solely based on political animus and retribution. Indeed, Defendants do not dispute that DOE reportedly identified more than 600 awards to potentially terminate as part of its review process, but took action against only these 314, all located in Blue States. Pls.' Br. 10. And Defendants' discussion of the awards terminated in *May*, five months before the terminations at issue, is a non-sequitur. Plaintiffs do not challenge the May terminations or allege that they were tied to the October terminations; only the latter occurred on the first day of the government shutdown, announced by Director Vought as targeting specific states, immediately after the President and Director Vought publicly said they would target programs they viewed as affiliated with the Democratic Party in the event of a shutdown.

Pointing to media reports and an "independent analysis" by a think tank, Defendants also note that the October terminations would have produced downstream benefits in some Red States. Opp. 7–8 & nn.20–26; *see also id. at* 14. For one, those third-party materials confirm the central factual premise of Plaintiffs' lawsuit: that "every single canceled award was for a project led by a company based in a Democrat-led state." Maeve Allsup, *Scoop: These Are the 321 Awards DOE is Canceling*, Latitude Media (Oct. 2, 2025), https://perma.cc/B9F7-483X (cited at Opp. 7 n.20). More generally, it is quite odd for Defendants to point to external sources about which states would be affected by the terminations, when Vought specifically identified the states that *the government* associated with the terminated awards and whose citizens the government was targeting in carrying out the terminations. The constitutional question concerns that targeting, not whether some downstream impacts would have spilled over into other states.

In short, Defendants offer no sworn account of a neutral basis for the October terminations and do not deny the partisan motives reflected in their own statements. The Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Perkins Coie LLP v. DOJ*, 783 F. Supp.

9

3d 105, 168 (D.D.C. 2025) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). The Court should reject Defendants' attempted reframing and evaluate Plaintiffs' constitutional claims based on the unrebutted factual record Plaintiffs have presented.

**B.    Terminating Awards Exclusively in Blue States Violates the Fifth Amendment's Equal Protection Guarantee**

    *1.    The Differential Treatment of Awardees in Blue States Is Not Rationally Related to Any Legitimate State Interest*

Defendants misapprehend the nature of an equal protection claim in arguing that the Challenged Terminations pass rational basis review because, in the abstract, the government could have a rational basis for terminating the relevant awards, such as effectuating the President's "goals and priorities." Opp. 14. The relevant question is not whether the government would have a legitimate interest in taking the challenged action in the absence of differential treatment of similarly situated entities; rather, "[i]n equal protection challenges the critical question is always whether there is an appropriate governmental interest suitably *furthered by the differential treatment at issue.*" *TikTok Inc. v. Garland*, 122 F.4th 930, 966 (D.C. Cir. 2004) (emphasis added) (quoting *Cmty-Serv. Broad. of Mid-Am., Inc. v. FCC*, 593 F.2d 1102, 1122 (D.C. Cir. 1978)). "Even in the absence of a fundamental right or a suspect classification, equal protection requires that a classification between similarly situated individuals bear some rational relationship to a legitimate state purpose." *Brandon v. D.C. Bd. of Parole*, 734 F.2d 56, 60 (D.C. Cir. 1984).

Defendants do not dispute that the 314 terminated awards are similarly situated to the roughly 350 other, non-terminated awards on DOE's list of over 600 awards to potentially terminate, *see* ECF No. 8-9. And Defendants have identified no legitimate government interest for this differential treatment. Defendants do not claim, and could not plausibly claim, that *only* the 314 terminated awards to recipients in Blue States do not further the Administration's goals and priorities, while the roughly 350 remaining awards (also issued in the prior Administration) do.

There is no reasonable dispute that the only reason Defendants treated these similarly situated entities differently is animosity toward the political views of citizens of certain states.

Animus of any kind is not a legitimate basis for official government action. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534–38 (1973); *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 447–50 (1985); *Romer v. Evans*, 517 U.S. 620, 632–35 (1996); *United States v. Windsor*, 570 U.S. 744, 770–74 (2013). Nor is disdain or disfavor for certain political views, or a desire for retribution against those holding certain political views. *See Heffernan v. City of Paterson*, 578 U.S. 266, 270–73 (2016). Defendants suggest otherwise, albeit without explicitly saying so, when they assert that "political considerations are routine when it comes to spending federal funds." Opp. 18. But Defendants' effort to liken their conduct here to earmarks, pork-barrel spending, and other forms of politicking collapses under even minimal scrutiny.

Earmarks and pork-barrel spending refer to "a government appropriation for a project or program that will benefit a legislator's *constituents*." Wirtz & Clement, *Both sides of the pork trough*, Fed. Reserve Bank of Minneapolis, Mar. 1, 2008 (emphasis added), *available at* https://perma.cc/8N9T-AWP6. There is no animus involved in members of Congress seeking to increase funding for their own constituents, nor is there when the President or congressional leaders secure the vote of a legislator through directing spending to the legislator's district. Those routine forms of coalition building and legislative self-interest bear no resemblance to the federal government singling out 314 already-awarded grants for disfavored treatment because of the political views of the citizens of the states where the grantees are located. That is not ordinary "funnel[ing] federal funds based on political or geographic considerations." Opp. 18.[5]

---

[5] Defendants are incorrect that the Supreme Court held that the Equal Protection Clause allows partisan discrimination in redistricting. The Court held only that, in the unique context of redistricting, there were no "judicially manageable standards" for courts to police equal protection violations. *Rucho v. Common Cause*, 588 U.S. 684, 691 (2019).

11

Defendants further argue that there can be no equal protection violation because Plaintiffs' "allegations of animus pertain to *States*, which are not protected by the Equal Protection Clause." Opp. 16. As discussed further on the First Amendment claim, Plaintiffs allege that Defendants terminated the awards based on animus against the political views of the citizens of Blue States, not the States themselves. More importantly, Plaintiffs assert their *own* equal protection rights, not the equal protection rights of States or anyone else. Plaintiffs have been subject to differential treatment relative to similarly situated entities, based on Defendants' political animosity toward others who they associated with Plaintiffs, which is not a legitimate basis for that differential treatment. If a public school failed students whose parents voted for Republican candidates, that would violate the students' equal protection rights, even if the government's animus was directed at the parents' political views rather than the students'.

In short, the government has put forward no legitimate state interest that is rationally related to the differential treatment that Plaintiffs have suffered, and without any such legitimate interest, the terminations violate equal protection.

2. *The Terminations Violate Equal Protection Regardless of the Governing Standard for Animus Claims*

Because Defendants point to no legitimate state interest for the differential treatment of Plaintiffs relative to similarly situated entities, Defendants' arguments (at 15–16) over the proper standard for finding equal protection violation in "animus" cases is academic. The government's actions indisputably must relate to some legitimate state interest, and they do not here given the undisputed evidence that the partisan views of the citizens of the states where awardees reside was the sole reason for the differential treatment underlying the October 2 terminations.

So, even if the Court were to apply Defendants' proposed standard for "animus" cases drawn from *Trump v. Hawaii*, 585 U.S. 667 (2018)—that is, "whether the challenged actions 'can

12

reasonably be understood to result from a justification independent of unconstitutional grounds,' not whether animus is one motivating factor" (Opp. 16)—Plaintiffs are still likely to succeed on the merits. The presidential proclamation upheld in *Trump v. Hawaii* followed a 50-day, multi-agency worldwide review and a cabinet-level recommendation, was premised on identified information-sharing and vetting deficiencies, and was revised over time to add and remove countries. The proclamation survived constitutional scrutiny, the Supreme Court explained, because "there [was] *persuasive evidence* that the entry suspension has a legitimate grounding in national security concerns, quite apart from any religious hostility," so it could "reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705–06.

Here, there is no analogous independent justification for the differential treatment at issue. Defendants identify no contemporaneous action memoranda, selection criteria, analyses, or records showing why these particular grants and grantees—all residing in states singled out for political punishment—were selected for termination relative to others. Unlike in *Trump v. Hawaii*, there is simply no developed record—or any record evidence at all—that the selective October terminations resulted from a "justification independent of unconstitutional grounds." *Id.*

Moreover, although unnecessary for the Court to resolve Plaintiffs' equal protection claims, Defendants are wrong that *Trump v. Hawaii* changed the law governing equal protection claims based on alleged animus. The Court's analysis there rested on the principle that the "fundamental sovereign attribute" of admitting and excluding foreign nationals is "largely immune from judicial control." 585 U.S. at 702 (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). The Court stated that on "matters of entry and national security," any constitutional rule that would "'inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,'" and so judicial review, in that context, is "highly constrained." *Id.* at 704 (quoting *Mathews v. Diaz*, 426 U.S. 67, 81–82 (1976)). The Court thus

13

applied a form of rational-basis review specially tailored to the admissions and national-security context and held that the challenged presidential proclamation would be upheld so long as it "can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 705.

Nothing in that reasoning suggests that courts must abandon *Arlington Heights*' "motivating factor" analysis when they review domestic classifications and spending decisions, where no comparable immigration or foreign-affairs prerogative is in play. The Supreme Court itself has made that clear: even after *Trump v. Hawaii*, the Court has continued to invoke the *Arlington Heights* "motivating factor" standard as the governing framework in the domestic policymaking context. In *Allen v. Milligan*, the Court stated that "[d]emonstrating discriminatory intent … 'does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purpose[].'" 599 U.S. 1, 37 (2023) (quoting *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (alterations by the Court)). And in *DHS v. Regents of the University of California*, the Court stated that "[t]o plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." 591 U.S. 1, 34 (2020) (quoting *Arlington Heights*, 429 U.S. at 266)). Defendants' suggestion that, after *Hawaii v. Trump*, Plaintiffs must prove that animus was the sole conceivable justification for the government's conduct is irreconcilable with these cases.

Nor does the Court's more recent order in *Trump v. Orr* change the equal protection standard. That decision is an emergency stay order concerning federal passport policy "with foreign affairs implications," not a merits decision redefining domestic equal protection law. *See Trump v. Orr*, No. 25A319 (U.S. Nov. 6, 2025) (per curiam order). The entirety of the Court's animus analysis is a single sentence, which stated that "on this record, respondents have failed to establish that the Government's choice to display [passport holders' sex at birth] 'lack[s] any

14

purpose other than a bare … desire to harm a politically unpopular group.'" *Id.*

*Arlington Heights* remains good law, as do *Moreno*, *Cleburne*, and *Romer*, which define the animus line outside the immigration and national-security context. Plaintiffs easily meet the relevant standards under these cases to show that animus was a motivating, but-for factor in the selective termination of the relevant awards. As discussed, Plaintiffs have made a strong, unrebutted evidentiary showing that animus motivated Defendants' selection of the awards to terminate on October 2. Vought's social media post announcing the termination is the smoking gun, and the statements by President Trump and Vought surrounding the terminations, promising to target programs associated with Democratic interests, removes any doubt as to what Vought meant. *See* Pls.' Br. 15 (quoting Jacobson Decl. Exs. H, I, J). The burden therefore shifts to Defendants to show that they would have made the same decision to selectively terminate these awards absent that improper motive, and they have not even tried to carry their burden.

Finding an equal protection violation here under the *Arlington Heights* framework would not, as Defendants claim (at 19), constitutionalize every instance of politically tinged spending. Beyond the obvious differences discussed *supra* between the facts here and earmarks or pork-barrel spending, what makes this case unique is the combination of: (1) an explicit, contemporaneous statement that the challenged actions were undertaken to target projects affiliated with States whose citizens have disfavored political views; (2) the perfect correspondence across hundreds of data points that the challenged actions to take away financial assistance were limited to awardees in states whose citizens hold disfavored political views; (3) a complete absence of any contemporaneous, neutral explanation for that pattern, or even an after-the-fact explanation in litigation; and (4) no effort by the government to prove that it would have selectively terminated these grants in the absence of animus. Recognizing an equal protection violation on those facts would not open the floodgates; it would simply apply settled doctrine.

15

### C.     The Challenged Terminations Violate the First Amendment

As with the equal protection claim, Defendants do not dispute the factual allegation at the core of Plaintiffs' First Amendment claims: that Defendants terminated the relevant awards because of disfavor for the political viewpoints and voting history of the citizens of the states where the awardees reside. As mentioned, Defendants submit no declaration or other evidence to dispute this allegation, and their brief does not meaningfully dispute it either. Instead, Defendants make three arguments: (1) Plaintiffs lack third-party standing to assert violations of the First Amendment rights of others; (2) "States themselves" do not have First Amendment rights; and (3) viewpoint discrimination and retaliation against speech are permissible in the context of federal government funding. Opp. 20–25. None of these arguments holds water.

### 1.     Plaintiffs Have Third-Party Standing

Although plaintiffs "generally" must assert violations of their own legal rights, rather than the rights of third parties, this is a "prudential consideration[]," not a constitutional requirement. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 (1984). The Supreme Court has long-recognized that "there are situations where competing considerations outweigh any prudential rationale against third-party standing," and the Court "has relaxed the prudential-standing limitation when such concerns are present." *Id.* at 956.

Typically, a party must make two showings to maintain third-party standing: (1) that "the party asserting the right has a close relationship with the person who possesses the right"; and (2) that "there is a hindrance to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 129. But the Supreme Court has significantly relaxed these requirements in two contexts. *Id.* at 130. First, the Court has "lessen[ed] … prudential limitations on standing" "within the context of the First Amendment." *Id.* Second, "[the] Court has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction *against the litigant* would result indirectly

16

in the violation of third parties' rights." *Id.* (quotations omitted) (citing cases). Both of these special circumstances are present here.

Plaintiffs' claims of viewpoint discrimination and retaliation against protected speech certainly are brought "[w]ithin the context of the First Amendment." *Id*. And these claims implicate the reasons why the Supreme Court is "quite forgiving" in permitting third-party standing to challenge First Amendment violations. *Id.* There is unique concern that those whose First Amendment rights are targeted will be chilled in challenging the violation, and "society as a whole [is] the loser" if First Amendment violations go unchallenged. *Munson Co.*, 467 U.S. at 955. Indeed, "viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024). Here, an average citizen whose views were the impetus for the federal government terminating billions of dollars in federal funding will likely be reluctant to expose themselves to further retaliation by challenging the government in litigation, especially with this particular administration that has widely targeted perceived political adversaries. And "society as a whole would be the loser" if the egregious First Amendment violations in this case were left unaddressed. *Munson Co.*, 467 U.S. at 955. Consequently, even if "there is no showing that" citizens of Blue States "cannot bring [their] own lawsuit" (although there is, *see infra*), Plaintiffs still must be permitted to challenge Defendants' First Amendment violations. *Id.*; *see Ryan, LLC v. Lew*, 934 F. Supp. 2d 159, 169 (D.D.C. 2013).

Independently, Plaintiffs possess third-party standing because "enforcement of the challenged [actions] *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 129 (quotations omitted). This is a classic case where "[t]he enforcement of the challenged government action against the [Plaintiffs] … results in the violation of third parties' rights." *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025) (finding third-party standing). The government has taken action against Plaintiffs in terminating their awards or

17

the awards for which they benefitted—causing Plaintiffs "direct, pocketbook injury"—and the government's effectuation of these actions will result in the violation of the First Amendment rights of third parties, the citizens of Blue States. *New Jersey v. Trump*, 131 F.4th 27, 39 (1st Cir. 2025) (quoting *Barrows v. Jackson,* 346 U.S. 249 (1953)). The Supreme Court has made clear that Plaintiffs have third-party standing in these circumstances.

Even if this Court applied the general two-part test for third-party standing, without consideration of the special circumstances presented here, Plaintiffs would possess third-party standing to bring their First Amendment claims. First, Plaintiffs maintain a "close relation" to the relevant third parties, as that phrase has been defined in this context. Because "the reason for the close relation factor is to ensure that the plaintiff will act as an effective advocate for the third party," the D.C. Circuit "has only required a 'close relation' in the sense that there must be an identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC*, 164 F.3d 37, 43–44 (D.C. Cir. 1999) (quotations omitted). Neither a "confidential," "contractual," nor personal relationship is required. *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 361 (D.D.C. 2020).

Here, there is no reason to doubt that Plaintiffs "will act as an effective advocate for" the parties whose speech is targeted. *Lepelletier*, 164 F.3d at 43. The non-profit plaintiffs have suffered severe harm to their organizational missions, and many Plaintiffs have incurred substantial financial injuries, due to the violations of the First Amendment rights of the citizens of the states where awardees reside. Plaintiffs share the interest of those citizens in enjoining the violations of the citizens' rights, and Plaintiffs will advocate for those interests without reservation. Plaintiffs thus satisfy the close relation factor. *See id.* at 361–62; *Ryan, LLC*, 934 F. Supp. 2d at 166–67.

As to the second factor, the citizens of Blue States whose First Amendment rights are being violated face "hindrances" to bringing suit themselves. Courts apply a "lenient standard" for the

18

hindrance requirement, under which "a plaintiff need only show that there is some impediment to the real party in interest's ability to assert his own legal rights." *Turner*, 502 F. Supp. 3d at 362 (quotations omitted). One impediment to Blue State citizens bringing suit is Article III standing. The government would argue in any such suit that citizens have an "undifferentiated" injury from all other citizens in their state. *United States v. Richardson*, 418 U.S. 166, 177 (1974). The government would further argue that citizens of Blue States cannot show the termination of a given DOE award caused the citizen to suffer a "particularized," "imminent," and "certainly impending" financial or other concrete injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Courts regularly find third-party standing where the relevant third parties may not have Article III standing to vindicate their own rights. *See, e.g.*, *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 119 (D.D.C. 2012); *Cicchetti v. Davis*, 2008 WL 619013, at *5 (S.D.N.Y. Mar. 5, 2008); *Kounitz v. Slaatten*, 901 F. Supp. 650, 655 (S.D.N.Y. 1995). Were it otherwise, no party would have standing to challenge certain unlawful government actions, a result that "[t]he third-party standing doctrine serves to avoid." *Tyndale*, 904 F. Supp. 2d at 119. Prudential considerations weigh strongly against rendering Defendants' First Amendment violations immune from review.

### 2. *The Terminations Violate the First Amendment Rights of Citizens*

On the merits, Defendants misconstrue the nature of Plaintiffs' First Amendment claims in contending that the claims cannot succeed because "States themselves" do not "have rights protected by the First Amendment." Opp. 21. Plaintiffs assert violations of the First Amendment rights of *citizens* of the States where awards were terminated, not the rights of the "States themselves." States do not vote or possess political viewpoints; their citizens do. Defendants' termination of the relevant DOE awards reflects discrimination against the political viewpoints of the citizens of Blue States, and retaliation for how they have voted and who they have elected.

19

Defendants barely dispute this fact. The closest they come is asserting that Vought's post on X announcing the terminations "shows only that DOE's terminations reflect the different spending priorities of a new executive administration." Opp. 20. But far from focusing on new policy priorities, Vought highlighted that "[t]he projects are in the following states," listing sixteen specific Blue States. Vought thus made clear that DOE awards were chosen for termination on the first day of the government shutdown not based on policy concerns, but rather based on the location of the awardees. That reality is confirmed by the fact that Defendants terminated DOE awards only in Blue States while maintaining awards to recipients in Red States for the exact same program or type of work as the terminated awards. *See* Pls.' Br. 16.

In the end, Defendants argue that their actions were lawful even if the terminations did reflect discrimination against a particular political viewpoint and retaliation for how citizens had voted. *See* Opp. 25. But Defendants cite no other context in which the Supreme Court has held that viewpoint discrimination and retaliation against protected speech are permissible, and Defendants provide no reason why federal grantmaking would be the singular exception to these bedrock constitutional protections. Defendants again argue that these terminations are comparable to earmarks and pork-barrel spending, but they are not remotely comparable from a First Amendment perspective. Efforts by a member of Congress to secure additional funding for his constituents, or even for certain politically advantageous purposes, is nothing like Defendants' systematic stripping of already-awarded funding from hundreds of recipients based on *disfavor* for the political viewpoints of citizens associated with the funding.

Simply put, there is no federal spending exception to the First Amendment, and Defendants' "intermediary strategy" of terminating Plaintiffs' awards to "punish" the speech of certain citizens violates the First Amendment. *Vullo*, 602 U.S. at 197–98.

### III.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm

Defendants contend that Plaintiffs' injuries are purely economic and fully compensable through a suit for damages under the Tucker Act. That argument ignores both black-letter law and the record. Plaintiffs have established multiple, independent forms of irreparable harm: (1) ongoing equal protection and First Amendment injuries; (2) severe and irreversible disruption to their missions, projects, and relationships with state and local partners; and (3) the absence of any adequate remedy at law, including in the Court of Federal Claims.

To begin, Defendants are wrong to suggest that Plaintiffs must show more than a likely constitutional violation to establish irreparable harm. The D.C. Circuit has long held that "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, suits seeking declaratory and injunctive relief "against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself," *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). The Supreme Court has likewise recently held that likely First Amendment violations "lead to irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam). And the same holds true for equal protection violations. *See Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019). Plaintiffs' ongoing constitutional injuries are irreparable and warrant relief.[6]

---

[6] The cases Defendants cite (at 26) do not upset this rule. In *Archdiocese of Washington v. WMATA*, 97 F.3d 314, 334 (D.C. Cir. 2018), the D.C. Circuit recognized that, had the plaintiff shown a likelihood of success on its First Amendment claim, the constitutional injury would be irreparable harm. *Hanson v. District of Columbia*, 120 F.4th 223, 244–46 (D.C. Cir. 2024), was limited to an alleged Second Amendment violation where the plaintiff had not provided any evidence that he would be harmed by the challenged limit during the pendency of the litigation and had consented to a stay of proceedings pending appeal while not seeking to expedite the appeal.

Even if the Court demanded more than constitutional injury, the record independently demonstrates irreparable harm. Defendants' terminations do not merely reduce Plaintiffs' revenues; they are forcing the dismantling of complex, multi-year projects that cannot be "turned back on" later with a check from the Treasury. Plaintiff organizations have already begun winding down staff, canceling sub-awards and sub-contracts, and halting work with partners. *See* Pls.' Br. 23–25. Those disruptions inflict, *inter alia*, the loss of specialized staff and institutional know-how that took years to build; the destruction of carefully structured joint initiatives with states, municipalities, utilities, companies, and community-based organizations; the abandonment of projects on the cusp of implementation that are time-sensitive and will not be resurrected once partners have moved on; and damage to Plaintiffs' goodwill and reputations as reliable partners for state and local governments, funders, communities, and businesses. *See id.*

These sorts of injuries are quintessentially irreparable. They involve lost opportunities, trust, and capacity, and entail dire threats to many of the non-profit Plaintiffs' missions. These are not discrete past-due invoices that can be tallied up when the dust settles. The D.C. Circuit has recognized irreparable harm where government action "unquestionably ma[kes] it more difficult" for organizations to fulfill their missions and where lost opportunities cannot be recreated later. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016). So too here. Once Plaintiffs cancel sub-awards, shutter projects, and lose the cooperation of states and localities, there is "no do-over and no redress." *Id.* (citation omitted). The communities and public entities that would have received technical assistance, infrastructure improvements, or workforce training during the grant period will simply go without. These harms are occurring now, and they are not remediable through a later award of damages.

Defendants barely engage with this evidence. Instead, they repeatedly relabel it as "economic" harm. *See* Opp. 26–28. But the harm to Plaintiffs' missions, partnerships, and ability

22

to deliver services is qualitatively different from ordinary lost profits; it is precisely the sort of forward-looking, structural injury that preliminary relief is designed to prevent.

Defendants lean heavily on *Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) and related decisions to argue that economic injury is not irreparable unless it "threatens the very existence of the movant's business." But those cases address a very different situation: private firms seeking to enjoin regulatory changes that might reduce future profits, where full monetary relief would be available if the challenge ultimately succeeds. Two features of those cases are missing here. First, Plaintiffs' harms are not "purely economic." As discussed, they include constitutional injury, mission impairment, loss of goodwill, and long-term damage to relationships. Those are classic forms of irreparable harm. *See, e.g.*, *Mills*, 571 F.3d at 1312 (constitutional harms); *Newby*, 838 F.3d at 8–9 (mission impairment and lost opportunities). Second, Defendants have not shown—and cannot show—that Plaintiffs have a certain, complete, and timely monetary remedy. *Wisconsin Gas*, 758 F.2d at 674. Defendants insist that Plaintiffs have "an adequate path to pursue [monetary] relief in the Court of Federal Claims. Opp. 27. But, as described above, that court lacks jurisdiction over Plaintiffs' constitutional claims. *Supra* Section I. That is not an "adequate remedy at law"; it is a confirmation that equitable relief is necessary.

Finally, with respect to the three Challenged Terminations for which "DOE has not sent any termination letter," Opp. 6 n.12, injunctive relief is equally necessary to remedy ongoing irreparable harm. These awards were listed as among those terminated on the spreadsheet that DOE itself created and sent to Congress of awards on or around October 1. ECF No. 8-3. Defendants pointedly do not *deny* these grants have been terminated or slated for termination. And the awardees and beneficiaries of the award such as the Environmental Defense Fund (EDF) are suffering real injuries—right now. As explained in the supplemental declaration of Elizabeth Lieberknecht, attached hereto, DOE has cut off communication with the awardees since the

23

termination announcements, the awardees cannot access any of the grant funds, and the three projects are not moving forward as a result. *See* Lieberknecht Suppl. Decl. ¶¶ 2–13.[7] In other words, Defendants have said that they terminated these awards and are acting accordingly, so the absence of termination letters appears to be just another unexplained procedural irregularity.

## IV.    The Public Interest and Balance of the Equities Favor an Injunction

Plaintiffs have shown a strong likelihood that DOE terminated the awards at issue in violation of equal protection and the First Amendment. An injunction would halt that unconstitutional targeting and restore the pre-termination status quo while the Court decides the merits. That serves the public interest in two ways: The public has an overriding interest in ensuring that the federal government administers its programs "evenhandedly and not based solely on … political viewpoint, or associations or perceived associations with a particular political movement, position, or viewpoint." *True the Vote, Inc. v. Internal Revenue Serv.*, 2019 WL 2304659, at \*5 (D.D.C. May 30, 2019), *reconsideration granted in part*, 2020 WL 5656694 (D.D.C. Sept. 23, 2020). And the public has a strong interest in these awards' goals of lowering the cost of energy, expanding access to clean, affordable energy, and ensuring healthier lives by reducing pollution. *See* Pls.' Br. 25–26.

The government responds on the equities that an injunction would force DOE to disburse funds that it "may not be able to recover." Opp. 29. That fear is overstated, speculative, and does not outweigh Plaintiffs' strong countervailing interests. Plaintiffs seek only to preserve already-awarded grants that DOE terminated mid-stream, not to compel new awards or expand programs. The injunction would maintain, not upend, the status quo. And the government identifies no concrete evidence that any funds disbursed under an injunction would truly be unrecoverable, or

---

[7] Plaintiffs respectfully request leave to file this supplemental declaration pursuant to Local Civil Rule 56.1(c). Defendants have stated that they do not oppose this request.

that DOE lacks close-out and claw-back tools if it ultimately prevails. The government's claimed harm is, at most, temporary disbursement of appropriated funds for projects Congress already chose to support. By contrast, if Plaintiffs are correct on the merits, but no injunction issues, their harms cannot be meaningfully undone. *See supra* Section III.

The government argues that the public interest "favors limiting federal courts to the jurisdiction and remedies provided by Congress," invoking the Tucker Act and the Court of Federal Claims. But Congress did not provide the Court of Federal Claims jurisdiction to remedy these constitutional violations. *Supra* Section I. As for the government's assertion that it always suffers institutional injury when enjoined from "effectuating statutes" (Opp. 30), that principle plainly does not apply here, since Plaintiffs are not asking the Court to nullify any statute. Plaintiffs ask the Court to prevent DOE from wielding its grantmaking powers in a way that violates equal protection and the First Amendment. The Executive has no cognizable interest in implementing actions infected by animus or viewpoint discrimination. Enjoining such actions vindicates, rather than undermines, public confidence in the fair administration of government.

## V.    The Court Should Waive or Impose a Nominal Bond

The Court should exercise its broad discretion under Federal Rule of Civil Procedure 65(c) to require no bond. *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971). Because Plaintiffs are nonprofits and a municipal government, many severely injured financially by the Challenged Termination, requiring more than a nominal bond would be highly inequitable. It would divert scarce resources from their important work serving the public good and "would have the effect of denying [them] their right to judicial review." *Id.*

## CONCLUSION

For these reasons above and in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion.

25

Dated: December 9, 2025                    Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar 1016621)
Stephen K. Wirth (D.C. Bar 1034038)
John Robinson (D.C. Bar 1044072)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave. NW, Suite 301
Washington, DC 20016
Tel: (301) 823-1148
dan@jacobsonlawyersgroup.com

*Counsel for Plaintiffs*

Vickie L. Patton (CO Bar 30370)*
Peter Zalzal (CO Bar 42164)*
Rosalie Winn (CO Bar 52662)*
Stephanie Jones (NY Bar 5590724)*
2060 Broadway, Suite 300
Boulder, CO 80302
(720) 837-6239
vpatton@edf.org

*Counsel for Plaintiff Environmental Defense Fund*

LYNDSEY OLSON
Saint Paul City Attorney

By: /s/ Kelsey McElveen
Kelsey McElveen[+]
Office of the City Attorney
15 W. Kellogg Blvd., 400 City Hall
Saint Paul, MN 55102
(651) 226-8710

*Counsel for Plaintiff Saint Paul, Minnesota*

*Pro hac vice forthcoming
[+]Pro hac vice pending

26