**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————— )
                                           )
**CITY OF SAINT PAUL, MINNESOTA,**         )
**et al.,**                                )
                                           )
        **Plaintiffs,**                    )
                                           )
              **v.**                       )        **Case No. 25-cv-03899 (APM)**
                                           )
**CHRISTOPHER WRIGHT,**                    )
*in his official capacity as Secretary of Energy*, )
**et al.,**                                )
                                           )
        **Defendants.**                    )
———————————————————————— )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Plaintiffs are awardees and subawardees of environmental project grants from the United States Department of Energy (DOE).[1]  They are located in states whose citizens tend to vote for or recently voted for Democratic Party candidates in state and national elections— including in the 2024 presidential election.  Just after the beginning of the recent government shutdown, both Director of the Office of Management and Budget (OMB) Russel Vought and President Donald Trump posted on social media about canceling funding that aligned with Democratic Party priorities.  DOE terminated Plaintiffs' grants shortly thereafter.  Plaintiffs then filed suit, alleging that the award terminations violated the Fifth Amendment's guarantee of equal protection of the laws and the First Amendment's prohibition against viewpoint discrimination and retaliation for protected expression.

---

[1] Plaintiffs are the City of Saint Paul, Minnesota; Interstate Renewable Energy Council; Plug In America; Elevate Energy; Southeast Community Organization; and Environmental Defense Fund.

For the reasons that follow, the court enters judgment in favor of Plaintiffs on their Fifth Amendment claim. Plaintiffs, however, lack standing to challenge Defendants' actions[2] on First Amendment grounds.

## II.    FINDINGS OF FACT

This case is before the court in an unusual posture. Plaintiffs initially moved for a preliminary injunction, and the court held a hearing on the motion. Since then, with the parties' consent, the court has consolidated Plaintiffs' motion with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *See* Stipulation Regarding Consolidation Under Rule 65(a)(2), ECF No. 27 [hereinafter Stipulation], at 1. In addition, Defendants have stipulated to certain facts as undisputed, which Plaintiffs agree obviates the need for discovery. *See id.* at 1–2. Accordingly, sitting as the trier of fact, the court makes the following factual findings upon which it bases its decision.[3]

Plaintiffs received millions of dollars in grant funding from DOE to support various environmental projects like electric vehicle development, updating building energy codes, and addressing methane emissions. *See* Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 12–17, 32–42. Seven grants totaling $27.6 million are at issue here. *Id.* ¶ 42; *see* Stipulation of Voluntary Dismissal, ECF No. 26 (voluntarily dismissing Plaintiffs' claims with respect to the three other awards included in the Complaint).

In May 2025, DOE Secretary Christopher Wright issued a press release announcing the agency's plan to conduct a "case-by-case" review of some of the grants awarded by the prior presidential administration. Compl. ¶ 43 & n.3 (citing *Secretary Wright Announces New Policy*

---

[2] Defendants are the Secretary of DOE Christopher Wright and Director Vought, in their official capacities, and their respective agencies.
[3] The court primarily relies on those facts Defendants have acknowledged are true in their filings or did not contest at the preliminary injunction hearing, as well as the facts to which they have stipulated.

*for Increasing Accountability, Identifying Wasteful Spending of Taxpayer Dollars*, U.S. Dep't of Energy (May 15, 2025), https://perma.cc/N82J-F3JR). The agency, however, did not notify Plaintiffs of any change in their grant status. Their grants therefore remained in effect.[4]

That changed in early October 2025. On October 1, 2025, the day the most recent government shutdown began, Director Vought posted on X that "[n]early $8 billion in Green New Scam funding to fuel the Left's climate agenda is being cancelled. More info to come from @ENERGY. The projects are in the following states: CA, CO, CT, DE, HI, IL, MD, MA, MN, NH, NJ, NM, NY, OR, VT, WA." Pls.' Mot. for Prelim. Inj. & Consolidation Under Rule 65(a)(2), ECF No. 8 [hereinafter Pls.' Mot.], Ex. J, ECF No. 8-12. None of the listed states voted for President Trump in the 2024 election. Compl. ¶ 47.

The next day, President Trump posted on Truth Social that he had met with Director Vought to "determine which of the many Democrat Agencies, most of which are a political SCAM, he recommends to be cut" during the shutdown. Compl. ¶ 45 & n.6; *see* Tr. of Hr'g. on Pls.' Mot., ECF No. 18 [hereinafter Hr'g Tr.], at 59:13-22 (acknowledging posts on Truth Social). That same day, DOE issued a press release stating that it had terminated "[315] financial awards[5] supporting 223 projects, resulting in a savings of approximately $7.56 billion dollars for American taxpayers." Pls.' Mot., Ex. K, ECF No. 8-13. The agency had "determined that these projects did not adequately advance the nation's energy needs, were not economically viable, and would not provide a positive return on investment of taxpayer dollars." *Id.* Plaintiffs' grants were among the 315.

---

[4] Defendants concede that a grant termination is not final until the grant recipient receives notice of such action. 12/18 Status Conf. Tr., ECF No. 23, at 19:20-23.
[5] The Secretary's announcement stated that there were 321 grant terminations, Pls.' Mot., Ex. K, ECF No. 8-13, but the actual number was 315. DOE had terminated six awards months before. *See* Pls.' Mot., Mem. of P. & A. in Supp. of Pls.' Mot., ECF No. 8-1 [hereinafter Pls.' Mem.], at 8 n.1.

Termination letters quickly followed. But they were "unusual." Hr'g Tr. at 43:22–44:8. They were not on formal DOE letterhead. Instead, Plaintiffs received notices "that just said 'Department of Energy' typed at the top." *Id.* at 43:22-25; *see, e.g.*, Pls.' Mot, Ex. C, ECF No. 5 [hereinafter Termination Letter], at 2 (CM/ECF Pagination). A week later, Defendants sent identical letters on formal agency letterhead. *See* Termination Letter at 4. The letters echoed the message expressed in the DOE press release. They informed Plaintiffs that their awards are "not consistent with this Administration's goals, policies and priorities" of "ensuring affordable, reliable, and abundant energy to meet the growing demand and/or" do not "address[] the national emergency declared pursuant to Executive Order 14156." *Id.*

The terminated grants had one glaring commonality: all the awardees (but one) were based in states whose majority of citizens casting votes did not support President Trump in the 2024 election.[6] These are so-called "Blue States," or states that "tend to elect and/or [have] recently elected Democratic candidates in state and national elections," including for President of the United States in 2024.[7] Stipulation at 1–2. Defendants admit that "[a] primary reason for the selection of which DOE grant termination decisions were included in the October 2025 notice tranche was whether the grantee was located in a 'Blue State.'" *Id.* So, Defendants concede that the political identity of a terminated grantee's state, including the fact that the state supported Vice President Kamala Harris in the 2024 election, played a preponderant role in the October 2025 grant termination decisions.

---

[6] The lone exception was a grantee located in Canada. *See* Pls.' Mem. at 8.
[7] Each Plaintiff is located in a Blue State. *See* Pls.' Mot., Decl. of Anne Evens, ECF No. 8-16, ¶ 2 (Elevate Energy, Illinois); Decl. of Christina M. Nichols, ECF No. 8-17, ¶ 7 (Interstate Renewable Energy Council, New York); Decl. of Joel Levin, ECF No. 8-18, ¶ 2 (Plug In America, California); Decl. of Russ Stark, ECF No. 8-19, ¶ 2 (City of Saint Paul, Minnesota); Decl. of Ianni Houmas, ECF No. 8-20, ¶ 2 (Southeast Community Organization, Minnesota); Decl. of David Lyon, ECF No. 8-21, ¶¶ 3, 10 (Environmental Defense Fund, New York and Colorado).

Spared from termination were the recipients of similar awards located in so-called "Red States," i.e., a state whose majority of citizens casting votes did support President Trump in the 2024 election. Pls.' Mot., Decl. of Daniel F. Jacobson, ECF No. 8-2, ¶ 4; Ex. B, ECF No. 8-4. Defendants concede that Plaintiffs' grants were otherwise "comparable to certain other [DOE] awards that (a) are to prime awardees *not* in Blue States, and (b) did not receive letters terminating their awards in October 2025." *Id.* (emphasis added).[8]

This disparate treatment is vividly illustrated by how DOE handled grants for programs that cut across both Blue States and Red States. For the Grid Resilience and Innovation Partnership (GRIP) program, for example, "only projects in states that voted for Vice President Harris were cancelled on October 2, 2025, while similar projects in states that voted for President Trump were not." Pls.' Mot., Mem. of P. & A. in Supp. of Pls.' Mot., ECF No. 8-1 [hereinafter Pls.' Mem.], at 10 (citing *Grid Resilience and Innovation Partnerships (GRIP) Program Projects*, U.S. Dep't of Energy, https://perma.cc/4WZ5-YCWN); *see* Hr'g Tr. at 42:12–43:4 (Defendants stating they had "no contrary evidence" and thus "no personal basis to deny" this). The same is true for the DOE initiative to improve access to methane emissions monitoring data in Appalachia. "DOE cancelled awards to California- and Illinois-based awardees while leaving substantively identical awards to Oklahoma[] and Pennsylvania awardees in place." Pls.' Mem. at 10.

## III.    JURISDICTION

Before proceeding to the merits, the court begins with Defendants' jurisdictional challenge. The argument proceeds as follows. In general, the United States and its agencies are "immune

---

[8] Plaintiffs allege more broadly that the 315 terminated awards were culled from a list of more than 600 awards nationwide that DOE had sent to OMB for potential termination. *See* Pls.' Mem. at 10; Pls.' Mot., Ex. G, ECF No. 8-9. The number 600 is based on a list—perhaps leaked—that appeared in an online news article. *See* Pls.' Mot., Ex. L, ECF No. 8-14. Defendants declined to confirm the authenticity of that list. *See* Hr'g Tr. at 40:12–41:8. The court therefore has not made a specific finding about how many so-called Red State grants DOE did not terminate in October 2025. But the court accepts Defendants' stipulation in lieu of discovery that may have shown this allegation to be true.

from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). Under Section 702 of the Administrative Procedure Act (APA), "Congress has provided a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Id.* at 1105–06 (quoting 5 U.S.C. § 702). But Section 702's waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.* at 1106 (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017); 5 U.S.C. § 702). Defendants argue that the Tucker Act is that statute in this case, as the D.C. Circuit has interpreted it to "confer exclusive jurisdiction over *breach of contract* claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims, and thus to impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA." *Id.* (cleaned up) (emphasis added). Never mind that Plaintiffs assert only *constitutional* claims. Defendants still insist that the court "lacks jurisdiction over [them] because they seek to enforce a contractual obligation to pay money and accordingly may only be heard in the Court of Federal Claims." Defs.' Mem. in Opp'n to Pls.' Mot., ECF No. 14 [hereinafter Defs.' Opp'n], at 9–10 (citing 28 U.S.C. § 1491(a)(1)).

The court has jurisdiction. The D.C. Circuit has long recognized that district courts have jurisdiction over constitutional claims, even if they arise from a contractual relationship with the government: "under § 702 and the Tucker Act, litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court." *Transohio Sav. Bank v. Director, Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992), *abrogated on other grounds as*

*recognized in Perry Capital*, 864 F.3d at 620.  Litigants may do so even when, as here, "the claims depend on the existence and terms of a contract" and "the relief sought is an order forcing the government to obey the terms of a contract."  *Id.*  "[T]he fact that a favorable outcome might require the payment of money is no impediment to jurisdiction."  *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 WL 1865160, at *7 (D.D.C. July 7, 2025).

Defendants point to two recent Supreme Court orders in which the Court concluded that the district court lacked jurisdiction over challenges to similar federal grant terminations. *See Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (citation omitted); *NIH v. Am. Pub. Health Ass'n* (*NIH*), 145 S. Ct. 2658, 2659 (2025).  But those cases are inapposite.  They involved claims brought under the APA, not the Constitution.  *See Vera*, 2025 WL 1865160, at *8–9 (discussing *California*); *Am. Pub. Health Ass'n v. NIH*, 791 F. Supp. 3d 119, 126 (D. Mass. 2025) (district court decision finding violations of the APA only); *see also* Compl. ¶¶ 71–85. And as already established, the court has jurisdiction over the latter.

Defendants disagree with this distinction.  They state that "Tucker Act jurisdiction turns on whether the claim is, in essence, a contract claim, even when plaintiffs invoke another area of law to claim that the contract was terminated unlawfully."  Defs.' Opp'n at 12.  As Defendants see it, "Plaintiffs bring contract claims, notwithstanding their invocation of constitutional provisions." *Id.*  But the "source of the rights upon which [Plaintiffs] base[] [their] claims," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), is "the Constitution, not any grant award," *Vera*, 2025 WL 1865160, at *7 (citing *Harris County v. Kennedy*, 786 F. Supp. 3d 194, 204–07 (D.D.C. 2025)).  That the court "may have to rule on a contract issue does not . . . automatically transform" the case into an action "on the contract and deprive the court of jurisdiction it might otherwise have."  *Megapulse*, 672 F.2d at 968.

7

In any event, circuit precedent is clear.  *See Transohio*, 967 F.2d at 610.  While Defendants argue that the above-cited Supreme Court orders compel a different conclusion, *see* Defs.' Opp'n at 12, the court is bound by on-point circuit precedent unless "intervening Supreme Court authority . . . 'effectively overrule[s], *i.e.*, eviscerate[s], the law of [the] circuit," *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024) (quoting *Bahlul v. United States*, 77 F.4th 918, 925 (D.C. Cir. 2023)).  Supreme Court authority addressing only contract claims brought under the guise of the APA does not "eviscerate" the circuit's consistent holdings that federal district courts have jurisdiction over constitutional claims like the ones at issue here.  *See also NIH*, 145 S. Ct. at 2662 (Barrett, J., concurring) (recognizing that "[t]he jurisdictional scheme governing actions against the United States" creates the potential for "[t]wo-track litigation" (first alteration in original) (citation omitted)).  The court therefore concludes that it has jurisdiction.

## IV.    MERITS

The court now turns to the merits.  It first analyzes whether Defendants' grant-termination decisions run afoul of the Fifth Amendment's guarantee of equal protection of the laws.  It then discusses the First Amendment claim.

### A.    Equal Protection

Under the Fifth Amendment, the federal government may not deny equal protection of the laws.  *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954); *Pollack v. Duff*, 793 F.3d 34, 45 (D.C. Cir. 2015).  When the government treats one group differently from another, the classification must withstand the appropriate level of scrutiny.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  The parties do not dispute that Defendants drew a classification between grantees located in Blue States and grantees located in Red States.  *See* Pls.' Mem. at 14–15; Stipulation at 2.  And

the parties agree that rational basis review governs its constitutionality.  *See* Pls.' Mem. at 13; Defs.' Opp'n at 14.

To satisfy rational basis review, the "classification must be rationally related to a legitimate government purpose."  *Clark*, 486 U.S. at 461.  Plaintiffs do not contest that Defendants have proffered a legitimate purpose for its actions: administering grant programs consistent with the agency's priorities.  *See* Defs.' Opp'n at 15; Hr'g Tr. at 10:13–11:4.  The question is whether the classification Defendants drew is rationally related to that purpose.

It is not.  Without more, there is no reason to believe that terminating an award to a recipient located in a state whose citizens tend to vote for Democratic candidates—and, particularly, voted against President Trump—furthers the agency's energy priorities any more than terminating a similar grant of a recipient in a state whose citizens tend to vote for Republican candidates or voted for President Trump.  There is no evidence that Plaintiffs, for example, receive more funding than other grantees or use the funding for projects the agency views as uniquely fruitless.  *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) (reasoning that the government does not violate equal protection merely because it elects to take things "one step at a time, addressing itself to the phase of the problem which seems most acute").  In fact, Defendants concede that Plaintiffs' seven terminated grants are "comparable" to awards to grantees in Red States that were not terminated.  Stipulation at 1–2.  The only identifiable difference—the grant recipient's state's political identity and, specifically, its electoral votes cast against President Trump—does not provide a rational basis for why Defendants chose to terminate Plaintiffs' grants over others to advance their stated interest of aligning grant funding with agency priorities.  *Cf. U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) ("For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare

9

[governmental] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

Defendants offer no explanation for how their purposeful segregation of grantees based on their electoral support for President Trump rationally advances their stated government interest. *See* Hr'g Tr. at 50:6–59:25; *cf. Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 229 (D.D.C. 2018) ("[U]nlike with arbitrary and capricious review under the APA, 'the government may defend the rationality of its actions on any ground it can muster, not just the one articulated at the time of decision.'" (citation omitted)). Moreover, Defendants represent that "it would be [legally] sufficient for equal protection purposes to find that a primary reason for the . . . termination decisions at issue here . . . is because of location in blue states." 12/18 Status Conf. Tr., ECF No. 23 [hereinafter 12/18 Conf. Tr.], at 8:13-17; *see also id.* at 7:11-24, 25:24-25; 12/17 Status Conf. Tr., ECF No. 21, at 14:9–15:4.; 12/22 Status Conf. Tr., ECF No. 25 [hereinafter 12/22 Conf. Tr.], at 13:23–14:1. The court thus concludes that Defendants' decisions to terminate Plaintiffs' grants violate the Fifth Amendment.

Defendants respond with two primary arguments. First, they contend that Plaintiffs' "allegations of animus pertain to *States*, which are not protected by the Equal Protection Clause." Defs.' Opp'n at 16. That assertion incorrectly frames Plaintiffs' claim. Plaintiffs protest Defendants' unequal treatment of *their* grant funding based on a classification between *grantees* that is not rationally related to a legitimate government interest. That is the essence of an equal protection claim. *See Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (describing the "unremarkable and widely acknowledged tenet of this Court's equal protection jurisprudence that state action subject to rational-basis scrutiny does not violate the Fourteenth Amendment when it 'rationally furthers the purpose identified by the State'" (citation omitted)). Proof of animus is

not an essential component of their claim.  *See id.* (stating that "negative attitudes" or "fear" in decision-making cannot alone make out an equal protection claim).

Second, Defendants defend their consideration of "partisan politics" in making discretionary funding decisions, asserting that such action does not offend the Equal Protection Clause.  *See* Defs.' Opp'n at 17–19; Hr'g Tr. at 53:17–55:9.  They argue that "political considerations are routine when it comes to spending federal funds," analogizing the award terminations to "pork barrel" spending.  Defs.' Opp'n at 18–19.  But much like their argument about animus, this contention misses the point.  The key question is whether Defendants' deliberate grouping of awardees based on whether the state in which they reside voted for President Trump is rationally related to DOE's stated objective of aligning grant funding with the new administration's priorities.  To ask the question is to answer it.  As noted, Defendants themselves have offered no plausible rational connection.

Also, Defendants' analogy to pork-barrel spending falls flat.  As Plaintiffs point out, "Members of Congress securing more money for their districts . . . is wholly different from taking away congressionally appropriated and already awarded funds." Pls.' Reply in Supp. of Pls.' Mot., ECF No. 16 [hereinafter Pls.' Reply], at 9.  Moreover, unlike the grant termination-decisions at issue here, pork-barrel spending—although it secures benefits for one or some districts and not others—can be rationally related to a legitimate government interest.  For example, in *American Bus Association v. Rogoff*, 649 F.3d 734, 742–43 (D.C. Cir. 2011), a case on which Defendants rely heavily, *see* Defs.' Opp'n at 19; Hr'g Tr. at 50:14–51:22, the D.C. Circuit upheld a legislative exemption benefitting only a single Seattle charter bus service that transported fans to baseball games.  The court found it "rationally related to the legitimate governmental goals of accommodating handicapped fans, restoring more affordable service, and reducing traffic

congestion on game days." *Rogoff*, 649 F.3d at 742. Defendants have not offered any similar rational relationship between their segregation of Blue State and Red State grantees and a legitimate government interest.

*XP Vehicles, Inc. v. Department of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015), is also inapposite. *See* Defs.' Opp'n at 20; Hr'g Tr. at 52:10–53:3. There, the court found that the agency had articulated a rational basis for denying the plaintiff's loan application under the terms of the governing statute. *XP Vehicles*, 118 F. Supp. 3d at 76. While the plaintiffs alleged that the asserted explanation was merely pretext for political favoritism, the court concluded that "a pretext allegation alone is not sufficient to undermine an otherwise rational basis for government conduct." *Id.* at 77. Here, there is no rational basis to begin with. And this is not a case of mere pretext. Defendants transparently admit that a primary reason for their grant-termination decisions was the grantees' location in Blue States, and they concede that this primary reason is sufficient to succeed on an equal protection claim. *XP Vehicles* therefore does not help them.

The court also rejects Defendants' categorical position that the Fifth Amendment does not apply here at all. *See* Hr'g Tr. at 54:21–56:4, 57:18-22. As Defendants see it, the Fifth Amendment places guardrails on funding decisions only when the "differential treatment is . . . directed at a disfavored political group." *See id.* at 55:15–56:4 (referring to footnote 4 in *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), and its progeny). Plaintiffs, however, put it best: "There's no federal funding exception to the Equal Protection Clause." *Id.* at 66:3-4. "The Equal Protection Clause addresses *all* manner of distinctions between persons," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308 (2023) (Gorsuch, J., concurring) (emphasis added), and "demand[s] that *any* governmental distinction among groups be justifiable," *Fullilove v. Klutznick*, 448 U.S. 448, 496 (1980) (Powell, J.,

12

concurring) (emphasis added).  If the government is drawing a classification, then, "*[a]t a minimum*, [the] classification must be rationally related to a legitimate governmental purpose." *Clark*, 486 U.S. at 461 (emphasis added).  Discretionary funding decisions are no exception.

*    *    *

Before moving forward, the court wishes to emphasize the narrowness of its ruling.  By no means does the court conclude that the mere presence of political considerations in an agency action runs afoul of the Fifth Amendment's guarantee of equal protection.  That is not the law.  This case is unique.  Defendants freely admit that they made grant-termination decisions primarily—if not exclusively—based on whether the awardee resided in a state whose citizens voted for President Trump in 2024.  There is no rational relationship between that classification and Defendants' stated governmental interest.  Defendants' decisions to terminate Plaintiffs' grants therefore violate the Fifth Amendment.

### B.    First Amendment

Plaintiffs also challenge Defendants' grant-termination decisions on First Amendment grounds.  They contend that the grant terminations constitute both discrimination "on the basis of political viewpoint" and "retaliation against protected speech and association" because Defendants were "intentionally targeting DOE awardees in Blue States and entities carrying out those awards in order to punish states and their citizens for their political views."  Pls.' Mem. at 17–19.  Plaintiffs acknowledge that their First Amendment theory is "less straightforward than the equal protection harm where [they're] asserting [their] own equal protection rights."  Hr'g Tr. at 32:10-15.  For their First Amendment claim, Plaintiffs rely on third-party standing.  *Id.*; Pls.' Reply at 16–19.

Generally, a plaintiff "may assert only his own legal interests, and may not raise those of third parties."  *Int'l Ass'n of Machinists & Aerospace Workers v. FEC*, 678 F.2d 1092, 1099

13

(D.C. Cir. 1982). This prudential rule "is designed to 'limit access to the federal courts to those litigants best suited to assert a particular claim.'" *Id.* (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99–100 (1979)). However, "[t]his fundamental restriction on [courts'] authority admits of certain, limited exceptions." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Courts allow litigants to assert the rights of third parties when, among other conditions, the litigant has a "close relation to third party." *Id.* at 411. This requires an "identity of interests between the parties such that the plaintiff will act as an effective advocate of the third party's interests." *Lepelletier v. FDIC*, 164 F.3d 37, 44 (D.C. Cir. 1999). "Because third party standing is the 'exception' rather than the norm, the burden is on the plaintiff to establish that [he] has third party standing, not on the defendant to rebut third party standing." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (cleaned up).

Plaintiffs have not met their burden. As Defendants point out, the third parties whose rights are allegedly being violated are "aggregated, undifferentiated, [and] non-specific." Hr'g Tr. at 62:11-20. It is accordingly "hard to describe exactly whose rights" are being violated. *Id.* Plaintiffs seek to assert the rights of "the citizens of Blue States" in which they reside. Pls.' Reply at 18. While some of those citizens were arguably retaliated against because they voted for Democratic candidates, others were not because they voted for Republican candidates. For those citizens, Defendants' termination of Plaintiffs' grants did not "result[] in a violation of [the] third parties' rights" for which Plaintiffs can assert standing. *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 143 (D.D.C. 2002) (citing *Haitian Refugee Ctr. v. Gracey*, 809 F.3d 794, 808 (D.C. Cir. 1987)). Nor have Plaintiffs shown an identity of interests with such voters, who may support the administration's actions.

Even if the court were to view Plaintiffs as asserting standing on behalf of only Blue State citizens who voted for Democratic candidates or against President Trump, Plaintiffs still have not met their burden to show an identity of interests with these third parties. The court cannot be sure of those millions of citizens' views on, for example, environmental policies, federal grant programs, or Plaintiffs' missions. For that reason, Plaintiffs' "interests in challenging the [agency action]"—restoring their grant funding—may not be "completely consistent with the First Amendment interests" of the third parties on behalf of whom they brought the case—an interest in being free from discrimination or retaliation based on political viewpoint, the specifics of which are not known for each voter. *Sec'y of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 958 (1984). This complicates Plaintiffs' ability to "act as an effective advocate" for these third parties. *Lepelletier*, 164 F.3d at 44. It is thus unsurprising that Plaintiffs have not identified a single case embracing their broad theory of third-party standing.

The authorities on which they do rely are distinguishable. True, the Supreme Court has "lessen[ed]" the "prudential limitations on standing" in First Amendment cases. *Munson,* 467 U.S. at 956. Still, the Court found it important in *Munson* that the plaintiff's and the third parties' interests were perfectly aligned. *Id.* at 958. There, the identity of interests came from a vendor–client relationship. *Id.* The same was true in the other cases Plaintiffs cite. *See Lepelletier*, 164 F.3d at 43–44; *Ryan, LLC v. Lew*, 934 F. Supp. 2d 159, 166–67 (D.D.C. 2013). These cases do not compel a finding that Plaintiffs here—whose relationship with an undifferentiated mass of voters is far more attenuated—have an identity of interests with certain citizens of Blue States.[9]

---

[9] Plaintiffs also cite two cases in which courts found that plaintiff-states had third-party standing to sue to enjoin an executive order purporting to deny birthright citizenship. *See* Pls.' Reply at 17–18 (first citing *Washington v. Trump*, 145 F.4th 1013, 1025 (9th Cir. 2025); then citing *New Jersey v. Trump*, 131 F.4th 27, 39 (1st Cir. 2025)). Stark factual differences, both in the identity of the plaintiffs and the nature of the action challenged, render these cases of little help in determining whether there is an identity of interests between Plaintiffs and the third parties here.

*National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), also does not help Plaintiffs. *See* Pls.' Mem. at 19–20. *Vullo* did not address third-party standing because it did not need to; the plaintiff there alleged that its own First Amendment rights were violated. *See id.* at 180–81. Although, as here, the defendant in that case had taken its allegedly adverse actions "through private intermediaries," *id.* at 198, unlike here, the private intermediaries were not the ones who challenged them in court. *Vullo* therefore does not alter the court's conclusion that Plaintiffs lack standing.

## V.    REMEDIES

The court now turns to remedies. Plaintiffs have asked the court to (1) declare Defendants' challenged terminations unlawful, (2) preliminarily and permanently enjoin the challenged terminations, (3) preliminarily and permanently enjoin Defendants to restore the awards terminated pursuant to the challenged terminations, and (4) award reasonable costs and attorney's fees. Compl. at 24; Pls.' Mot., Proposed Order, ECF No. 8-23.

Having found Defendants' grant-termination decisions violate the Fifth Amendment's guarantee of equal protection of the laws, the court declares the challenged terminations unlawful.

As for the scope of injunctive relief, the court and the parties have had extensive discussions about the appropriate remedy over multiple status conferences. At a general level, all agree that if the court were to find Defendants' actions unconstitutional, it would be appropriate to return Plaintiffs to the status quo before the terminations. *See* 12/22 Conf. Tr. at 15:14–18:18; Stipulation at 2. The court accordingly vacates the October termination notices as to the seven awards at issue in this litigation.

To the extent Plaintiffs seek prospective injunctive relief, they "must establish a sufficient likelihood of *future* injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (emphasis

added).  The parties, however, have not briefed this issue, including the appropriate scope.[10]  The parties shall file a Joint Status Report that indicates whether Plaintiffs still seek such relief and, if so, proposes a briefing schedule.

In the same Joint Status Report, Plaintiffs shall also indicate if they still intend to move for attorney's fees.  If so, the parties shall propose a briefing schedule or, if applicable, indicate that they will do so following any briefing on prospective injunctive relief.

## VI.    CONCLUSION AND ORDER

For the foregoing reasons, the court concludes that Defendants' grant-termination decisions violate the Fifth Amendment.  The court therefore enters judgment in favor of Plaintiffs on the equal protection claim but dismisses the First Amendment claim.  The October termination notices for Award Nos. EE0011131, EE0011801, EE0009951, EE0011133, EE0010930, EE0010622, and FE0032276 are hereby vacated.

The parties shall file a Joint Status Report by January 16, 2026, which indicates whether Plaintiffs still seek permanent injunctive relief and whether Plaintiffs intend to move for attorney's fees.  The Joint Status Report also shall propose the necessary briefing schedules.

Dated:  January 12, 2026

_____
Amit P. Mehta
United States District Judge

---

[10] During status conferences, the court suggested that any prospective relief could do no more than enjoin Defendants from making future grant-termination decisions against these Plaintiffs based on the fact that they reside in a Blue State.  *See* 12/18 Conf. Tr. at 22:19–23:5.